ISBI
IFP     #4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

)
)
**AYODELE OKE, PLAINTIFF**     )     CIVIL CASE NO. 1:22-cv-159
)
)
v.     )
)
)
)     **DEMAND FOR JURY TRIAL**
**PERRIN**     )     **PURSUANT TO FED.R.CIV.P.38**
**JOSEFIK,**     )
**HARRIGER,**     )
**HOPKINS,**     )
**COULL,**     )
**T.BIEL,**     )
**LISA REEHER**     )
**BLUM,**     )
**MONGELLUZO,**     )
**ADAMS,**     )
**BLICHA,**     )
**OBERLANDER,**     )
**PERRY,**     )
**GUSTAFSON,**     )
     **DEFENDANTS,**     )
**In their individual and official**     )
**capacities**

**RECEIVED**

MAY 25 2022

CLERK, U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

## COMPLAINT

### INTRODUCTION

1. This is a civil action against several Defendants who are employed at S.C.I. Forest for, inter alia, violations of the Plaintiff's civil and constitutional rights.

2. The Plaintiff was retaliated against, by the Defendants listed in this complaint, for exercising his First Amendment Constitutional rights to free speech. The Defendants arbitrarily denied the Plaintiff certain privileges, among other things, due to his various complaints and

pg. 1

grievances regarding their [the Defendants] malicious and inappropriate

conduct.

3. At all relevant times hereto, the Defendants have acted outside the

scope of their employment, and they have also acted under the color of

state law.

4. Plaintiff, pursuant to Fed.R.Civ.Procedure Rule 38 and the Seventh

Amendment to the United States Constitution, demands a jury trial on

all issues raised in this civil action.

## PARTIES

5. Plaintiff, Ayodele Oke, was formerly a prisoner incarcerated at S.C.I.

Forest at the times the events listed in this complaint occurred. The

Plaintiff's mailing address is 303 Raintree Lane, Malvern, Pa 19355.

6. Defendant Perrin is a Unit Manager/employee at S.C.I. Forest;

Defendant Perrin is responsible for, inter alia, managing/overseeing I-

Unit at S.C.I Forest. Defendant Perrin's current address (for her place

of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa

16239.

7. Defendant Harriger is a correctional officer at S.C.I. Forest; Defendant

Harriger frequently worked on I-Unit at S.C.I. Forest at the times the

events detailed in this complaint occurred. Defendant Harriger's current

address (for her place of employment) is 287 Woodland Drive, P.O.

Box 945, Marienville, Pa 16239.

8. Defendant Josefik is a correctional officer at S.C.I. Forest. Defendant Josefik frequently worked on I-Unit at S.C.I. Forest at the time the events listed in this complaint occurred. Defendant Josefik's current address (for her place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

9. Defendant Hopkins is I-Unit's Counselor at S.C.I. Forest. Defendant Hopkins' current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

10. Defendant Coull is the treatment specialist at S.C.I. Forest. Defendant Coull's current address for her place of employment is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

11. Defendant Lisa Reeher is the grievance coordinator and the Superintendent's assistance at S.C.I. Forest; her current address (for her place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

12. Defendant T.Biel is the grievance coordinator at S.C.I. Forest; her current address (for her place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

13. Defendant Blum is a correctional officer at S.C.I. Forest; Defendant Blum's current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

14. Defendant Mongeluzzo is a deputy at S.C.I Forest. Defendant Mongeluzzo is a member of S.C.I. Forest's Program Review

Committee (hereinafter "PRC"). current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

15. Defendant Blicha is a major at S.C.I. Forest; Defendant Blicha is a member of S.C.I. Forest's Program Review Committee (hereinafter "PRC"). Defendant Blicha's current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

16. Defendant Oberlander is the Superintendent/Facility Manager at S.C.I. Forest. Defendant Oberlander's current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

17. Defendant Gustafson is the CCPM at S.C.I. Forest; Defendant Gustafson is a member of S.C.I. Forest's Program Review Committee (hereinafter "PRC"). Defendant Gustafson's current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

18. Defendant Adams is a deputy at S.C.I. Forest; Defendant Adams is a member of S.C.I. Forest's Program Review Committee (hereinafter "PRC"). Defendant Adam's current address (for her place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

19. Defendant Perry is a major at S.C.I. Forest; Defendant Perry is a member of S.C.I. Forest's Program Review Committee (hereinafter "PRC"). Defendant Perry's current address (for his place of employment) is 287 Woodland Drive, P.O. Box 945, Marienville, Pa 16239.

20. Defendants Blicha, Perry, Gustafson, Mongeluzzo, and Adams will be collectively referred to as "PRC".

## JURISDICTION AND VENUE

21. This Court has jurisdiction pursuant to 42 U.S.C. 1983, 28 U.S.C. 1331, 28 U.S.C. 1343(a)(3).

22. The Western District of Pennsylvania is the appropriate venue for this action to be heard, as all the causes of action have occurred in this district.

## FACTUAL BACKGROUND

23. On January 14, 2019, the Plaintiff was housed on "A" unit at S.C.I. Forest.

24. On January 14, 2019, at approximately 6:30 a.m., the Plaintiff was told by A-Unit correctional officers that he needed to pack his property because he was being moved to S.C.I. Forest's I-Unit.

25. I-Unit is a low security unit for low custody level two inmates at S.C.I. Forest.

26. The Plaintiff stated to the correctional officer that he did not want to go to I-Unit and that he did not understand why he was being moved there because he had never made such a request.

27. The C.O. stated to the Plaintiff that Defendant Perrin had requested that he [the Plaintiff] be moved to that unit.

28. On January 14, 2019, when the Plaintiff arrived on I-unit at approximately 10:00 a.m., the Plaintiff stated to Defendant Harriger that he did not want to be on that unit.

29. Defendant Harriger then went and retrieved Defendant Perrin who stated to the Plaintiff that he had to remain on I-Unit.

30. The Plaintiff then had a conversation with another correctional officer on I-Unit.

31. The Plaintiff stated to the correctional officer that he did not want to be on I-Unit and that he did not know why Defendant Perrin had requested that he be moved there.

32. The correctional officer then stated to the Plaintiff that there had been an "incident" on I-Unit just a week or so prior to the Plaintiff being moved to I-Unit.

33. The correctional officer stated to the Plaintiff that there had been a fight between two-three black inmates in one of the dormitories on I-Unit.

34. The correctional officer then stated to the Plaintiff that in an act of racial discrimination, Defendant Perrin removed several black prisoners

from I-Unit (even though most of the Black inmates were not involved in the alleged fight and had nothing to do with the alleged altercation).

35. The correctional officer then stated to the Plaintiff that PRC and the then Facility Manager Overmeyer had stated to Defendant Perrin that her actions of removing several black inmates from the unit, that were not involved in the altercation, were inappropriate.

36. The C.O. then stated to the Plaintiff that Defendant Perrin's actions were racially motivated and that they looked "bad" to her supervisors; therefore, an attempt was made by her to mitigate the damage from her racially motivated actions. Defendant Perrin had several Black inmates transferred back to I-Unit (and the Plaintiff was one of those Black inmates).

37. The Plaintiff complained to Defendant Perrin about being on the unit and she stated, to the Plaintiff, that she would remove him from the unit if he did not like being there after two weeks.

38. On or about January 28, 2019, the Plaintiff was moved back to A-Unit at his request.

39. In July of 2019, the Plaintiff was sent back to I-Unit. The Plaintiff did not complain about being on this unit at that time.

40. On October 2, 2019, the Plaintiff sent a request slip to Defendant Oberlander requesting the privilege of having an extra property box due to having several pending lawsuits. (An extra property box exception

allows inmates with a pending legal case to have an extra box to store their legal documents.)

41. Defendant Oberlander then stated in his response to the Plaintiff's request for an extra property box that he had forwarded his [the Plaintiff's] request to Defendant Perrin so that she could address the matter.

42. The Plaintiff did not receive a response back from Defendant Perrin regarding the request for an extra property box- despite having been notified by Defendant Oberlander that the Plaintiff needed an extra property box due to having several pending legal cases.

43. The Plaintiff had a civil action against Michelle Crowther (a Unit Manager at S.C.I. Forest) at the time he had requested an extra property box for legal reasons.

44. Unit Manager Michelle Crowther was temporarily the Unit Manager on I-Unit for approximately two weeks while Defendant Perrin was on vacation in August or September of 2019.

45. In January of 2020, the Plaintiff contacted Defendant Coull because he wanted to join the "Violence Prevention Program."

46. In January of 2020, the Plaintiff was scheduled to see the parole board in about seven months and he wanted to have the Violence Prevention Program completed before he was seen by the parole board. (Violence Prevention was a program that was mandatory for the Plaintiff to complete before he could be paroled.)

47. The Plaintiff was aware of certain inmates that were denied parole because they did not have their mandatory programs, such as Violence Prevention, completed.

48. Defendant Coull is the treatment specialist at S.C.I. Forest and she is in charge of programs such as Violence Prevention.

49. Defendant Coull stated to the Plaintiff that he would have to wait to get into Violence Prevention.

50. The Plaintiff then contacted Mr.Brendel, who is another regular treatment specialist at S.C.I. Forest, in regards to getting enrolled in his Violence Prevention Program.

51. Mr.Brendel told the Plaintiff that he probably would not get into Violence Prevention until July of 2020.

52. The Plaintiff complained to Defendant Coull and Mr.Brendel about not having been enrolled in the Violence Prevention Program.

53. Mr.Brendel told the Plaintiff that he probably would not get into the Violence Prevention Program until July of 2020.

54. The Plaintiff complained to Defendant Coull and Mr.Brendel about possibly being enrolled in the Violence Prevention Program late because he would not have it finished by the time that he was scheduled to see the parole board (which would almost guarantee his chances of being denied parole).

55. After having spoken with several black and white inmates regarding the issues concerning the Violence Prevention Program, the Plaintiff

started to notice that black Inmates, who were close to seeing parole, were not getting enrolled in their Violence Prevention Program fast enough and, consequently, the black inmates being were being denied parole.

56. However, the Plaintiff noticed that certain white inmates were being enrolled in the Violence Prevention Program faster than the black inmates (even though the white inmates were scheduled to see the parole board later than the black inmates).

57. The Plaintiff believed that he had made prima facie showing of racial discrimination perpetuated by Defendant Coull.

58. The Plaintiff contacted Defendant Coull and Defendant Gustafson (who is Defendant Coull's supervisor), regarding this racial discrimination.

59. The Plaintiff stated to Defendant Coull and Defendant Gustafson, via request slip, that Defendant Coull was racially discriminating against black inmates and systematically putting white inmates ahead of black inmates for enrollment in the Violence Prevention Program (even though the white inmates were not scheduled to see the parole board until after the black inmates).

60. The Plaintiff stated that Defendant Coull's racially motivated actions were putting black inmates at a severe disadvantage for parole purposes and, subsequently, black inmates were being denied parole because their mandatory Violence Prevention Program had not been completed.

61. Defendant Gustafson forwarded my request slip regarding my complaints about the racially discriminatory practices to Defendant Coull.

62. In January of 2020, the Plaintiff was in the education building at S.C.I. Forest when he saw Defendant Coull. (The Plaintiff was waiting in the hallways for his carpentry class.)

63. Defendant Coull then asked the Plaintiff if he really believed that she [Defendant Coull] was racially discriminating against black inmates and the Plaintiff replied "Yes."

64. The Plaintiff then told Defendant Coull that he was going to file a grievance and contact the prison society about this issue.

65. The Plaintiff filed a grievance regarding Defendant Coull's racial discrimination. The Plaintiff stated in his grievance, among other things, the following: "I am being denied Equal Protection and I am being racially discriminated against while other inmates are put into these program(s) in a more timely and appropriate manner."

66. The grievance was assigned to Defendant Gustafson for disposition and investigation.

67. On or about February 2, 2020, Defendant Gustafson denied the Plaintiff's grievance, but the Plaintiff was subsequently enrolled in the Violence Prevention Program (which is the relief that the Plaintiff was seeking).

68. In late February of 2020 or early March of 2020, the Plaintiff had seen Mr.Crissman for a psychological evaluation. (Mr.Crissman is I-Unit's psychological counselor.)

69. Mr.Crissman stated to the Plaintiff that he believed that he was mentally fit to be paroled and that he [the Plaintiff] would make an evaluation stating as such.

70. Mr.Crissman also stated to the Plaintiff that he was going to recommend him for the outside clearance program because he [Mr.Crissman] believed that he had no restrictions preventing him from doing so (and because he believed that it was a program that would "look good" for parole).

71. Outside Clearance is an institutional work program where the lowest custody inmates are assigned jobs outside the normal secure areas of the institution.

72. Outside clearance programs often result in increased pay for inmates relative to other institutional job assignments and it gives the inmate experience in certain work-related activities.

73. Outside clearance job assignments often give the inmate the opportunity to work out in a public community and the program often helps to properly prepare the inmate for job assignments when they are released.

74. In late March of 2020 or early April of 2020 S.C.I. Forest went into a modified schedule due to the Covid-19 disease.

75. The Plaintiff sent Mr.Crissman a request slip asking if the institution was still processing inmates' requests for outside clearance and Mr.Crissman's response was that the Plaintiff's outside clearance proposal was submitted on March 20, 2020.

76. In late March of 2020 or in early April of 2020, an inmate in the Plaintiff's I-Unit dormitory believed that he was developing symptoms common to Covid-19 patients.

77. The Plaintiff's dormitory and unit went into a lockdown phase (pending the symptomatic inmate's test results for Covid-19 disease).

78. Eventually, the Plaintiff's dormitory (ID-1001) was allowed one (1) phone call and approximately thirty (30) minutes of recreation time.

79. Defendant Josefik was assigned to work I-Unit's 2p.m.-10 p.m. shift.

80. One day during the unit lockdown, Defendant Josefik stated to the Plaintiff that his dormitory probably would not get a chance to use the telephone because she claimed that there was not enough time.

81. The Plaintiff stated to Defendant Josefik that it was not fair that his dormitory (ID-1001) was the only unit that could not get on the telephone and that he was going to file a complaint/grievance against her about the issue.

82. Defendant Josefik stated that she would leave a note/message for I-Unit's 6 a.m.-2 p.m. shift informing them that the Plaintiff and his dormitory did not receive their scheduled phone calls.

83. The next day Defendant Harriger, who worked the 6 a.m.-2 p.m. shift on I-Unit, gave the Plaintiff and his dormitory two (2) phone call time slots (this was done to make up for the previous day's missed calls).

84. That same day at approximately 7:00 p.m., the Plaintiff asked Defendant Josefik when his dormitory was scheduled to go to the yard.

85. Defendant Josefik stated to the Plaintiff that he would probably not go to the yard because there wasn't enough time.

86. The Plaintiff stated to Defendant Josefik that he and the inmates in his dormitory were unfairly being denied recreation time (while all the other dormitories were allowed to engage in outside recreation).

87. The Plaintiff told Defendant Josefik that he wanted a grievance because he was going to file a grievance against her.

88. Defendant Josefik then became extremely aggressive, belligerent, and unprofessional when told by the Plaintiff that he was going to file a grievance against her.

89. Defendant Josefik pointed her finger in the Plaintiff's face, she called the Plaintiff an "asshole", and she then told the Plaintiff he was always "bitching" about something.

90. The Plaintiff and the inmates in his dormitory were then allowed to have their recreation time after several inmates complained about not getting their recreation time.

91. The Plaintiff and his dormitory were let off lockdown after the inmates
    Covid-19 test results came back negative; however, the Plaintiff's
    housing unit was still on a modified schedule.

92. In late April of 2020, the Plaintiff asked Defendant Hopkins if he could
    submit his request for outside clearance for processing and review.

93. The Plaintiff stated to Defendant Hopkins that Mr.Crissman had
    recommended him for outside clearance.

94. Defendant Hopkins stated to the Plaintiff that he should stop calling
    people "racist."

95. The Plaintiff stated to Defendant Hopkins that he did not know what he
    was referring to because he had not called anyone racist.

96. Defendant Hopkins stated to the Plaintiff that he had called Defendant
    Coull a racist while trying to enroll into his Violence Prevention
    Program.

97. Defendant Hopkins also stated to the Plaintiff that he had only wanted
    to get approved for an outside clearance work assignment because he
    [the Plaintiff] wanted it to help him with his chances of making parole.

98. The Plaintiff stated to Defendant Hopkins that he did not call anyone a
    "racist" and he then asked Defendant Hopkins if he was going to submit
    his outside clearance request.

99. Defendant Hopkins then stated to the Plaintiff that he would submit his
    application for an outside clearance housing assignment (but he also
    stated that he would investigate the alleged "racist" remarks).

100. The Plaintiff then sent a request slip to Defendant Mongelluzo, who is Defendant Hopkins supervisor, stating that he would like to apply for the outside clearance programs.

101. The Plaintiff then sent a request slip to Defendant Hopkins informing him, once again, that he wanted to have his outside clearance request.

102. On April 30, 2020, the Plaintiff spoke with Defendant Mongelluzzo and Defendant Blicha about his outside clearance request.

103. Defendant Blicha and Mongelluzo both stated to the Plaintiff that Defendant Hopkins would have to get the paperwork prepared and submitted for review.

104. The Plaintiff spoke with Defendant Hopkins, once again, in late April of 2020 and he asked him if then submitted his [the Plaintiff's] request for outside clearance.

105. Defendant Hopkins stated to the Plaintiff that he was not going to submit the Plaintiff's outside clearance proposal to PRC until after the Plaintiff was seen by the parole board.

106. PRC is made up of Defendants Mongelluzo, Blicha, Gustafson, Adams, and Perry.

107. PRC are essentially the supervisors of S.C.I. Forest.

108. For an inmate to be approved for outside clearance, the inmate must meet the criteria as specified by DC-ADM 805.

109. Thereafter, the inmate who applied for an outside clearance job/work assignment must have the appropriate documents prepared by his unit's counselor and unit manager as specified by DC-ADM 805.

110. After the appropriate paperwork had been prepared by the inmate's counselor and unit manager, the required documents must be submitted to PRC for review. The unit manager and counselor are required to give their recommendation as to whether they believe the inmate specified should be granted approval for an outside clearance job assignment.

111. PRC then votes on whether to grant the inmate's request for an outside clearance job assignment after the required relevant documents are reviewed.

112. PRC will then forward the inmate's documents to the institution's Facility Manager/Superintendent for review. The institution's Superintendent/Facility Manager has the final say as to whether the inmate will be granted an outside clearance work/job assignment.

113. Defendant Hopkins and Defendant Perrin had the responsibility of properly preparing the Plaintiff's outside clearance application and relevant documents and then submitting said documents to PRC for review.

114. Defendant Hopkins and Defendant Perrin were then obligated to tell the Plaintiff how long it would take to receive a decision for his outside clearance per DC-ADM 805.

115. Defendant Hopkins refused to prepare and submit, for review (to the required institution personnel), the Plaintiff's request for outside clearance at that time and, instead, Defendant Hopkins stated that he would do so after the Plaintiff had seen the parole board. (The Plaintiff would not see the parole board for approximately 5 months.)

116. The Plaintiff then decided to submit another request to Defendant Mongeluzo informing him that his request for outside clearance had not yet been processed.

117. Defendant Mongeluzzo stated the following in his response to the Plaintiff's request: "They [Defendant Perrin and Defendant Hopkins] will let you [the Plaintiff] know when it is finally being sorted."

118. On May 8, 2020, the Plaintiff asked Defendant Hopkins, once again, if he could submit his application for an outside clearance request.

119. Defendant Hopkins replied to the Plaintiff that he would not do so until after he [the Plaintiff] had been seen by the parole board.

120. The Plaintiff then stated to Defendant Hopkins that he did not see the parole board for another four (4) months or so and that it did not take that long to get the paperwork prepared, submitted, and reviewed.

121. Defendant Hopkins later called the Plaintiff to the correctional officer's desk to sign his Inmate Progress Report for parole.

122. An Inmate Progress Report is a document about how an inmate has performed at his assigned job.

123. On May 8, 2020, the Plaintiff's Inmate Progress Report was being prepared for his parole packet. (An Inmate Progress Report is an evaluation metric that also has value in determining whether an inmate should be granted parole.)

124. The Plaintiff noticed that his Inmate Progress Report had below average grades in several categories.

125. The Plaintiff's last Inmate Progress Report, which was in January of 2020, reflected that the Plaintiff's job conduct was above average; therefore, the Plaintiff was puzzled as to why he had below average grades in several categories.

126. The Plaintiff also noticed on his Inmate Progress Report that the entire "problem areas" section of the Inmate Progress Report had been left blank.

127. The "problem areas" section of the Inmate Progress Report should be marked/checked, have comments, and have notes in the categories where an inmate has been deemed problematic.

128. The fact that the problematic areas section of the Plaintiff's Inmate Progress Report had been left blank demonstrated to the Plaintiff that there weren't any documented or validated areas of concern (regarding his job assignment).

129. The Plaintiff also noticed that his Inmate Progress Report was not signed by his supervisor, which is Defendant Perrin.

130. C.O. Roy, who was the correctional officer who told the Plaintiff that he had to sign his Inmate Progress Report, stated to the Plaintiff, when asked, that he did not give the Plaintiff any below average grades (and that all the average grades came from him).

131. C.O. Roy then stated to the Plaintiff that it was Defendant Hopkins who gave him the below average grades.

132. The Plaintiff had an issue with the below average grades that he received because he knew that the document was being submitted with his parole information and that it could possibly be detrimental.

133. Defendant Hopkins was preparing the Plaintiff's information for submission to the pre-parole staff, which is the process that the Plaintiff must go through before being interviewed by the parole board.

134. The staff involved in pre-parole then submits the Plaintiff's documentation to the member of the parole board (after pre-parole staff conducts their interview with the inmate).

135. Since the Plaintiff entered S.C.I. Forest, he was instructed, by the Plaintiff, that he was to maintain (at least) an overall average grade on his Inmate Progress Report.

136. An inmate with a below average grade, according to the Inmate Progress Report, demonstrates the following behavior: "The inmate does not demonstrate a sincere interest in developing positive work habits. The inmate usually reports to work but shows little desire to perform or learn work without repeated orders. The inmate may

occasionally be disruptive in the work setting and/or demonstrate increasing absenteeism."

137. The Plaintiff was concerned that the Inmate Progress Report would affect him negatively for parole.

138. On May 8, 2020, shortly after the incident with the Inmate Progress Report, the Plaintiff had seen Defendant Mongelluzzo.

139. The Plaintiff stated to Defendant Mongelluzzo that Defendant Hopkins was refusing to submit his application for outside clearance to PRC until after he [the Plaintiff] had seen the parole board (which was about four months away).

140. The Plaintiff then stated to Defendant Hopkins that he was retaliating against him because he filed a grievance against Defendant Coull and that Defendant Hopkins did not want the outside clearance job assignment to help with the Plaintiff's chances for parole.

141. The Plaintiff also stated to Deputy Mongelluzzo that Defendant Hopkins stated to him [the Plaintiff] that he had to get the "clearances" before submitting the outside clearance request, which seemed non-sensical.

142. Deputy Mongelluzo then stated to the Plaintiff that he would investigate the matter promptly.

143. Shortly thereafter, the Plaintiff saw Defendant Perrin.

144. The Plaintiff stated to Defendant Perrin that he wanted to be approved for an outside clearance job assignment.

145. Defendant Perrin asked the Plaintiff if he had spoken with Defendant Hopkins about this issue.

146. The Plaintiff stated to Defendant Perrin that Defendant Hopkins was not being straightforward and that was why he was asking her.

147. Defendant Perrin then went and retrieved Defendant Hopkins from his office.

148. Defendant Perrin then instructed the Plaintiff to confront Defendant Hopkins with any issues that he had with him in front of her.

149. The Plaintiff then stated to Defendant Hopkins that he spoke with Defendant Mongeluzzo and that he stated that what Defendant Hopkins told him was incorrect, i.e., an inmate cannot get the clearances without the necessary documents having been processed, submitted, reviewed, and approved by PRC and the Superintendent.

150. Defendant Hopkins then stated to the Plaintiff that he shouldn't have gone over his "head" and complained to Defendant Perrin and Defendant Mongeluzzo about the issue.

151. Defendant Perrin and Defendant Hopkins then stated to the Plaintiff that he did not know what he was talking about regarding the outside clearance process.

152. Defendant Hopkins then stated to the Plaintiff that he probably was not going to get approved for an outside clearance job assignment because he was going to recommend that he be denied for the program.

153. Defendant Hopkins also stated to the Plaintiff that PRC and Defendant Oberlander will always go with what he and Defendant Perrin recommend.

154. Defendant Perrin then proceeded to laugh.

155. The Plaintiff then asked Defendant Hopkins why he was recommending that he be denied for an outside clearance job assignment.

156. Defendant Hopkins then stated to the Plaintiff that he was going to recommend that the Plaintiff be denied an outside clearance job assignment because he believed that the Plaintiff was "argumentative."

157. The Plaintiff stated that he did not know how he was being "argumentative."

158. Defendant Hopkins then stated to the Plaintiff that he was argumentative because he called Defendant Coull a "racist" and that he [the Plaintiff] continued to question him about the outside clearance process.

159. The Plaintiff stated to Defendant Hopkins that he never called Defendant Coull a racist, but that he [the Plaintiff] did claim that Defendant Coull had been engaging in racial discrimination when it came to scheduling black inmates for the Violence Prevention Program.

160. The Plaintiff then also stated that filing a grievance does not make him "argumentative."

161. The Plaintiff then stated that black inmates were being racially discriminated against when it came to enrollment in the Violence Prevention Program.

162. Defendant Hopkins then stated to the Plaintiff that he was only trying to get an outside clearance job assignment because he wanted it to help him increase his chances of parole, and that he [Defendant Hopkins] would not submit the vote sheet for outside clearance until after the Plaintiff had seen the parole board.

163. Defendant Perrin and Defendant Hopkins then went back into their office to contact Defendant Mongelluzzo about the conversation that he had with the Plaintiff in his regards to outside clearance.

164. Shortly thereafter, Defendant Perrin and Defendant Hopkins then came out of their office and stated that they had spoken with Defendant Mongelluzo about the outside clearance issue.

165. Defendant Perrin and Defendant Hopkins then stated that Defendant Mongelluzzo had stated that he never stated to the Plaintiff that Defendant Hopkins was incorrect about the outside clearance process.

166. Defendant Hopkins also stated that Defendant Mongelluzzo stated that he [the Plaintiff] shouldn't speak with him about the outside clearance issue again.

167. The Plaintiff then stated to Defendant Hopkins and Defendant Perrin that Defendant Mongelluzzo had been untruthful in his conversations with them.

168. Defendant Perrin then stated to the Plaintiff that he should not have gone over her 'head" and complained to Defendant Mongelluzzo about staff on her unit.

169. Defendant Perrin then stated to the Plaintiff that he was trying to make her [Defendant Perrin's] staff "look bad" and that Defendant Mongelluzzo and PRC do not know about the outside clearance work process as well as she does.

170. The Plaintiff then apologized to Defendant Perrin for complaining about her staff to their supervisors.

171. The Plaintiff only apologized to Defendant Perrin for reporting Defendant Hopkin's unethical and unprofessional misconduct, to Defendant Mongelluzzo, because the Plaintiff believed that Defendant Perrin would try and retaliate against him by not giving him her vote/recommendation for parole.

172. Thus, the Plaintiff felt compelled to soothe Defendant Perrin's massive ego and inflated sense of self-worth by apologizing and appealing to her false sense of superiority; otherwise, the Plaintiff risked not gaining her support for parole.

173. The Plaintiff then asked Defendant Perrin if she was going to give him the support for the parole board.

174. Defendant Perrin then replied that she would.

175. The Plaintiff then asked Defendant Perrin who gave him the below average grades on his latest Inmate Progress Report.

176. Defendant Perrin then claimed that she did not know.

177. The Plaintiff then ended the strenuous dialogue with Defendant Perrin and Defendant Hopkins.

178. The Plaintiff then sent a request slip to Defendant Mongelluzzo stating that he did not misquote the nature of their conversation that he had with him.

179. Defendant Hopkins had stated to Plaintiff that he had to get the "clearances" before he could submit the Plaintiff's vote sheet to PRC.

180. However, Defendant Hopkins miscommunicated the issue; the information that Defendant Hopkins needed/requested were not "clearances."

181. The information that Defendant Hopkins requested was from several departments in the institution which have pertinent information regarding the Plaintiff.

182. The information that is required for Defendant Hopkins to prepare a vote sheet for an inmates' outside clearance request is described in DC-ADM 805 Section 1(D)(1)(a)-(g).

183. Defendant Hopkins incorrectly referred to the information in DC-ADM 805 Section 1(D)(1)(a)-(g) as "clearances" which they were not. This led to the confusion with the Plaintiff.

184. In any event, Defendant Hopkins stated to the Plaintiff that he was not going to submit the Plaintiff's request for outside clearance until after he had seen the parole board (which was in approximately four months).

185. On May 10, 2020, the Plaintiff then sent a request slip to Defendant Perrin apologizing, once again, for complaining about Defendant Hopkins to her superiors. Again, this was a tactic employed by the Plaintiff to appease Defendant Perrin's hubris so that he would not unfairly and arbitrarily recommend that the Plaintiff be denied parole.

186. The Plaintiff also stated in his request to Defendant Perrin that he did not know why he had below average grades in his latest Inmate Progress Report; the Plaintiff explained that he did not have any documented instances of misconduct in regard to his job assignment; he [the Plaintiff] explained that he had worked every single day and multiple times a day since the prison was put on quarantine.

187. The prison was put on a quarantine schedule due to Covid-19.

188. During the prison's quarantine, the inmates' movements were severely restricted. Only a small group of inmates could have recreation at a certain time and several of the prison's activities and programs were either shut down or scaled back.

189. On I-Unit a small group of inmates were told to be "block workers" for their given/designated housing areas. This was done, in part, so that inmates would not associate in large groups (which the institution believed would halt or severely slow down the spread of Covid-19 should the virus come into the prison).

190. The block workers job was to clean various sections of his designated housing section of the unit at least four (4) times a day. (The Plaintiff was not even paid overtime for working several extra hours.)

191. The Plaintiff and only one (1) other inmate were instructed to clean their designated areas.

192. The Plaintiff did not understand how and why he obtained negative grades on his latest Inmate Progress Report and he asked Defendant Perrin because she was his job's supervisor.

193. Defendant Perrin stated in her response to the Plaintiff's request that he would "have to ask the unit correctional officers as to why he received negative grades."

194. Shortly thereafter, the Plaintiff asked Defendant Harriger, C.O. Reem, Defendant Blum, and C.O. Dotterer, whom all worked on I-Unit, if they were responsible for giving the Plaintiff a below average grade on his Inmate Progress Report.

195. C.O. Roy maintained his initial position that was made to the Plaintiff that Defendant Hopkins was responsible for the below average grades on his Inmate Progress Report.

196. On May 11, 2020, the Plaintiff submitted a request slip to Defendant Hopkins asking what the status of his outside clearance request was and if he had given him the vote for parole.

197. Defendant Hopkins stated the following in his response to the Plaintiff's request slip: "We have discussed your outside clearance

multiple times no matter what we tell you-. You either believe us or won't accept what we tell you____Over [sic]. You even went over both of our heads + [sic] went to the Deputy + [sic] the Answer [sic] remains the same. You will be notified about institutional support where the vote sheet returns."

198. The Plaintiff believed that Defendant Hopkins was going to retaliate against him for "going over his head" and complaining about him to Defendant Mongelluzzo. Consequently, the Plaintiff sent a request slip to Defendant Hopkins on May 13, 2020, stating that he [Defendant Hopkins] was correct and that he [the Plaintiff] was at fault.

199. Defendant Hopkins stated the following in his response: "Ok. Sounds good. Also, I already told you-the process has been started + [sic] vote sheet for outside clear [sic]-will go out when your parole comes back."

200. The Plaintiff sent the May 13, 2020, request slip to Defendant Hopkins apologizing because he believed that Defendant Hopkins was highly unprofessional and unethical and, therefore, Defendant Hopkins would try to retaliate against the Plaintiff for making complaints about him to his superior.

201. The Plaintiff has a right to make oral complaints about inappropriate and unethical staff behavior; however, Defendant Hopkins would retaliate against the Plaintiff for doing so.

202. Defendant Hopkins still maintained his position that he would submit the Plaintiff's outside clearance application for review after he [the Plaintiff] had seen parole-even though this is incorrect procedure.

203. DC-ADM 805 Section 1(D)(1)(e) states: "When all necessary information has been obtained, the counselor shall refer the request/application to his/her Unit Manager for review. The Unit Manager will then inform the inmate if they have failed to meet the criteria and inform the inmate of any actions he/she may take to become eligible, if applicable."

204. Defendant Hopkins should have submitted the Plaintiff's request when the pertinent information had been obtained and not when he arbitrarily wanted to do so.

205. DC-ADM 805 Section 1(F)(2) states: "Upon completion of the procedures set forth in subsection E above, the inmate shall be advised of the timelines for the review process, and that he/she will be notified of the final outcome by the Unit Manager and/or counselor."

206. Defendant Hopkins had an obligation to inform the Plaintiff of the timelines for the outside clearance review process; however, he violated this rule by stating that he will submit it for review approximately four (4) months later (or after the Plaintiff had seen the parole board).

207. On or about May 10, 2020, the Plaintiff submitted a request slip to Defendant Perrin requesting permission to have an extra property box due to several pending legal cases that he had.

208. The Plaintiff, in his request slip to Defendant Perrin, stated that he had a civil action pending against Michelle Crowther (who is another S.C.I. Forest Unit Manager) and the Plaintiff cited the civil case number.

209. The Plaintiff never received a response from Defendant Perrin regarding this extra property box request. (Inmates that have verifiable legal cases/matters are entitled to an extra property box in order to have adequate storage for their legal documents.)

210. An inmate that does not have permission for an extra property box is subject to a misconduct for contraband and his property can also be confiscated.

211. On May 21, 2020, the Plaintiff spoke with Defendant Hopkins about inmate parole factors.

212. Defendant Hopkins stated to the Plaintiff that he and Defendant Perrin would base their votes and recommendations, regarding whether an inmate should be paroled, on the inmate's institutional progress, housing reports, work reports, etc.

213. Defendant Hopkins stated to the Plaintiff that, to his best guess, his Inmate Progress Report was below average (or not favorable) because of the several below average grades.

214. Defendant Hopkins then stated to the Plaintiff that the Inmate Progress Report would be factored into he and Defendant Perrin's outside clearance recommendations.

215. Defendant Hopkins also stated to the Plaintiff that his superiors will defer to their decision when reviewing an inmate's request/application for outside clearance and parole.

216. Defendant Hopkins then stated the Plaintiff that Defendant Josefik was responsible for the below average grades on the Inmate Progress Report due to the Plaintiff having previously called her "unpleasant."

217. The incident regarding Defendant Josefik stemmed from a conversation that the Plaintiff had with her in mid or late April of 2020.

218. Regarding this decision, the Plaintiff had asked C.O. Manilla if he could make him copies of legal documents. (Legal copies were to be made on an inmate's unit at this time due to the Covid-19 quarantine.)

219. C.O. Manila stated to the Plaintiff that he could make him legal copies.

220. Defendant Josefik then came over to the Plaintiff and C.O. Manilla and she asked them both what they were conversing about.

221. C.O. Manila stated to Defendant Josefik that the Plaintiff had asked him to make copies of legal documents.

222. Defendant Josefik then asked the Plaintiff why he did not ask her to make the legal copies.

223. The Plaintiff stated to Defendant Josefik that he was not required to ask her and that he did not want to deal with her if it wasn't critical and/or necessary.

224. Defendant Josefik then stated to the Plaintiff that he was not going to receive any legal copies.

225. The next day Defendant Josefik asked the Plaintiff if he had an issue with her and, if so, why.

226. The Plaintiff stated that he did not want to have this discussion and that it was not relevant to her job description.

227. Defendant Josefik then demanded that the Plaintiff provide an answer as to why he had an issue with her.

228. The Plaintiff stated to Defendant Josefik that she was "unpleasant" due to having previously called him [the Plaintiff] an "asshole" (among other things).

229. The Plaintiff then stated to Defendant Josefik that he would follow the rules of the institution; however, if it is not required to speak with her, then he will not do so.

230. Due to having called Defendant Josefik "unpleasant", the Plaintiff was given below average grades according to Defendant Hopkins.

231. Defendant Hopkins also stated to the Plaintiff that this was the sole reason as to why he had below average grades on his Inmate Progress Report.

232. The Plaintiff then stated to Defendant Hopkins that calling Defendant Josefisk "unpleasant" had nothing to do with his work performance and that the comment, by the Plaintiff, was not made while working.

233. The Plaintiff then filed a grievance regarding his falsified Inmate Progress Report.

234. The Plaintiff stated in his grievance, inter alia, that his conduct/speech to Defendant Josefik was protected under the First Amendment and that he had been retaliated against for exercising his First Amendment right by Defendant Hopkins, Defendant Josefik, and Defendant Perrin.

235. On May 27, 2020, Defendant Hopkins called the Plaintiff into his office, with Defendant Perrin present, and told him that he had gained the institutions support to be paroled.

236. Defendant Hopkins then stated to the Plaintiff he and Defendant Perrin had been informed about a civil action which had been filed against Michelle Crowther, a S.C.I. Forest Unit Manager, by the Plaintiff.

237. The Plaintiff confirmed that he did have a pending civil action against Defendant Crowther for retaliation civil action.

238. Defendant Hopkins then stated to the Plaintiff that he should not have filed a civil action against Defendant Crowthers and that it was unnecessary.

239. Defendant Perrin then stated to the Plaintiff that he would not be receiving permission to have an extra-legal property box due to his filing of a lawsuit against Michelle Crowther.

240. The Plaintiff then stated to Defendant Perrin and Defendant Hopkins that he filed a grievance against the both of them (as well as Defendant Josefik).

241. The Plaintiff stated to Defendant Hopkins that his Inmate Progress Report was inaccurate and that it could negatively affect his chances of parole.

242. Defendant Hopkins then stated to the Plaintiff that a negative work report could harm an inmates' chances of being paroled.

243. Defendant Hopkins then stated to the Plaintiff that he was not going to submit his vote sheet for outside clearance, and that he [the Plaintiff] was not going to be approved for outside clearance while he and Defendant Perrin worked on I-Unit.

244. On or about June 1, 2020, Defendant Harriger had stated to the Plaintiff that she had spoken with Defendant Perrin and they had both concluded that he [the Plaintiff] needed to rescind grievance no.870064.

245. The Plaintiff stated that he was not going to rescind the grievance.

246. On June 4, 2020, between 7-8 p.m., Defendant Harriger made an announcement to allot the twenty-two (22) inmates on I-Unit that they needed to go inside their dorms or cells due to there being a staff assault.

247. An inmate had allegedly attacked a correctional officer on I-Unit.

248. Defendant Harriger then made an announcement to the unit that they were now locked down and could not even exit their housing area to use the bathroom.

249. Defendant Harriger then stated that she wanted to "send the entire IB-2003 housing area to the RHU [Restrictive Housing Unit]." (The inmate

who allegedly attacked the correctional officer was housed in dorm numbered/labeled I-B2003.)

250. The Plaintiff was housed in dorm ID-1001 at the time of the alleged assault.

251. The Plaintiff was not present when the alleged assault occurred, nor was the Plaintiff involved with the inmate who allegedly assaulted the correctional officer.

252. On June 5, 2020, at approximately 7:30 a.m.-7:45 a.m., Defendant Perrin appeared on I-Unit.

253. Defendant Perrin made an announcement to the inmates on the unit that the unit was no longer "locked down" and that normal operations would resume.

254. Defendant Harriger then stated to the unit that the block was "still kind on lockdown."

255. The unit was no longer on lockdown and Defendant Harriger was being vindicative, malicious, and unprofessional.

256. When a staff assault occurs on a unit, the appropriate prison staff must investigate the matter thoroughly to determine the details before re-opening the unit (or taking the unit off a lock down).

257. While the investigation is occurring, the designated staff who investigates the assault must remove all security threats related to the assault before re-opening the unit.

258. When the appropriate staff has concluded the investigation and determined that there is no longer a security threat to the institution/unit, then the staff will be told to remove the unit from lockdown.

259. On June 5, 2020, at approximately 11:30 a.m., the Plaintiff was told by Defendant Harriger that he was being removed from I-Unit and that he was going to be relocated to B-Unit.

260. The Plaintiff then asked Defendant Harriger why he was being removed from the unit and Defendant Harriger stated:" Because you've filed a grievance against Ms.Perrin, C.O. Josefik, and Mr.Hopkins and we will not tolerate you filing a grievance against the unit so we have decided that you should be removed."

261. Defendant Harriger then stated that Defendant Perrin had instructed her to make a list of inmates that she did not like and that they would be removed from the unit.

262. Defendant Harriger had stated to the Plaintiff that she "had made sure" that he was on that list to be removed.

263. Defendant Harriger and the Plaintiff had incidents on previous occasions.

264. On one prior occasion, in May of 2020, Defendant Harriger had removed the Plaintiff from being a block worker during the prison quarantine.

265. Inmates who were block workers were given certain extra privileges that the other inmates were not given (such as extra telephone privileges).

266. The Plaintiff was told by Defendant Harriger that he was being replaced as a block worker.

267. Defendant Harriger then assigned an overwhelming and disproportionate of the block worker positions to white inmates.

268. Defendant Harriger had even committed an act of mendacity and stated that she was replacing all the block workers when, in fact, she only replaced a small number of them (and the inmates removed from their job assignment were either all, or disproportionately, non-white).

269. The Plaintiff confronted Defednant Harriger about her racial discriminatory behavior and she stated to the Plaintiff: "I don't care."

270. Before the Plaintiff exited I-Unit on June 5, 2020, he asked Defendant Harriger if he was being issued a misconduct or was he in trouble for any alleged incidents and she stated to the Plaintiff that he was not.

271. On June 5, 2020, at approximately 1 p.m., the Plaintiff was moved to B-Unit.

272. While walking to B-Unit the Plaintiff saw Defendant Coull.

273. Defendant Coull asked the Plaintiff where he was going.

274. The Plaintiff stated to Defendant Coull that he was being moved to B-Unit from I-Unit.

275. Defendant Coull stated to the Plaintiff that she had told Defendant Hopkins about how he [the Plaintiff] had filed a grievance against her alleging racial discrimination.

276. The Plaintiff stated that he was aware of this because Defendant Hopkins had mentioned it.

277. Defendant Coull then stated to the Plaintiff that she had told Defendant Hopkins to "get back" at the Plaintiff somehow and that Defendant Hopkins later stated to her that he would seek revenge by denying the Plaintiff the recommendation for outside clearance.

278. Defendant Coull then stated to the Plaintiff that if he ever filed a grievance against her again, then she would give him a bad recommendation for the Violence Prevention Program (which would negatively affect the Plaintiff's chances of parole).

279. The Plaintiff then started to file several grievances against Defendants Hopkins, Perrin, Josefik, and Harriger.

280. On June 6, 2020, the Plaintiff filed grievance no.872471.

281. In grievance no.872471, the Plaintiff explained how Defendant Harriger stated to him that he was being removed from I-Unit because she and Defendants Perrin, Josefik, and Hopkins had agreed on it due to the Plaintiff's filing grievance no.870064.

282. The Plaintiff was moved from I-Unit to a regular general population unit (B-Unit), by Defendants Hopkins, Josefik, Perrin, and Harriger, to deny the Plaintiff certain extra privileges.

283. Due to Covid-19, S.C.I. Forest was on a quarantine schedule.

284. I-Unit is a low custody and security level unit. I-Unit is a level two security and custody level unit while the other blocks/units at S.C.I. Forest are a level four (4) (which means heightened security).

285. I-Unit inmates are entitled to extra recreation and phone time privileges that the rest of the institution was not given,

286. At the time the Plaintiff was removed from I-Unit, I-Unit was given at least an hour of outside recreation time every day, and an hour of either the dayroom, phone usage, kiosk usage, and the shower for a total of two (2) hours of recreation every day.

287. On June 8, 2020, I-Unit's recreation time increased to about four (4) hours a day while B-Unit (the unit that the Plaintiff was housed on after I-Unit), was only given about two (2) hours of recreation per day.

288. The extra recreation time allowed on I-Unit for inmates permitted them to make phone calls and it allowed them more time for recreation.

289. Defendant Blum, Defendant Josefik, and Defendant Perrin were aware of the fact that inmates on I-Unit were given extra recreational privileges because they had stated to the Plaintiff on previous occasions that he [the Plaintiff] could just be removed from I-Unit (if he continued to make oral complaints about misconduct), where he was receiving about two (2) hours of recreation , or be moved to a unit where he would only receive thirty (30) minutes of recreation every other day.

290. Defendant Perrin and Defendant Josefik stated this to the Plaintiff that it would be a form of punishment to remove him from I-Unit during the quarantine schedule because inmates on U-Unit received more recreational time than any other unit.

291. On June 6, 2020, the Plaintiff then filed grievance no.872467.

292. In grievance no.872467 the Plaintiff explained, inter alia, how Defendant Hopkins and Defendant Perrin retaliated against him and recommended a denial of an outside work assignment because he [the Plaintiff] filed grievances and make oral complaints about staff misconduct.

293. On June 8, 2020, the Plaintiff filed grievance no.872472.

294. The Plaintiff stated in Grievance no.872472 that Defendant Perrin had refused to give him an extra property box for his legal documents, which could have led to the Plaintiff being issued a misconduct for contraband (as well as having his property confiscated) because he filed a lawsuit against one of her [Defendant Perrin's] colleagues, i.e., Unit Manager Michelle Crowther.

295. On June 15, 2020, the Plaintiff filed grievance no.873770.

296. In grievance no.873770, the Plaintiff stated that Defendant Perrin and Defendant Harriger retaliated and racially discriminated against the Plaintiff (as well as other black inmates on the unit).

297. On June 12, 2020, the Plaintiff filed grievance no.873028.

298. In grievance no.873028 the Plaintiff stated, among other things, that Defendant Harriger demonstrated unprofessional conduct in violation of DOC Code of Ethics Section B(1).

299. On June 3, 2020, the Plaintiff had sent a request slip to Defendant T.Biel asking who grievance no.870064 was assigned to.

300. On June 5, 2020, grievance coordinator T.Biel, sent the Plaintiff's request slip back to him stating that grievance no.870064 had been assigned to Defendant Perrin for initial review/disposition.

301. On June 9, 2020, the Plaintiff sent a request slip to Defendant Perrin stating that she should recuse herself from reviewing and deciding the initial review response on grievance no.870064, and that she was in violation of DC-ADM 804 Section 1(c)(3).

302. DC-ADM 804 Section 1(C)(3) prevents an institutional prison staff member from presiding over a grievance in which they are directly or indirectly involved.

303. Defendant Perrin responded to the Plaintiff's request slip and stated the following: "I'm not named as the cause of the grievance. You indicated you spoke with me. You are grieving a housing eval."

304. On June 9, 2020, the Plaintiff then submitted a request slip to Defendant T.Biel stating that she had assigned grievance no.870064 to Defendant Perrin which was in violation of DC-ADM 804 Section 1(C)(3).

305. On June 12, 2020, Defendant T.Biel stated the following in her response to the Plaintiff: "After you receive the response you have the opportunity to appeal."

306. On June 11, 2020, the Plaintiff sent a request slip to Defendant Lisa Reeher stating that she had assigned grievance no.870064 to Defendant Perrin for disposition, which violated his [the Plaintiff's] rights.

307. On June 11, 2020, Defendant Lisa Reeher stated the following in her response to the Plaintiff's request slip: "After you receive the response you have the opportunity to appeal."

308. On June 30, 2020, Defendant Perrin filed a response to the Plaintiff's grievance no.870064. In Defendant Perrin's baseless response she stated, among other meritless contentions, the following: " The inmate has had several difficulties across different shifts accepting feedback and information....Feedback is for personal growth, which the unit counselor provided him."

309. On June 8, 2020, the Plaintiff sent a request slip to his counselor on B-Unit, i.e., Ms. Reed, asking her if his vote sheet had gone out to PRC and, if not, if she would put in his [the Plaintiff's] application for outside clearance.

310. On June 15, 2020, Ms.Reed stated the following in her response to the Plaintiff's request slip: "Hopkins is working on your parole so I have no idea if it was done or not, but my guess would be no since you were moved to B."

311. The Plaintiff thought it was strange that Defendant Hopkins would still be preparing documents for the Plaintiff's parole since his pre-parole documents had already been submitted for review by PRC and Defendant Oberlander.

312. When an inmate gets moved to another unit, his entire file is sent to his new unit so that the unit management team (counselor and Unit Manager) can have that inmate's file.

313. The Plaintiff started to speculate that Defendant Hopkins was not working on the Plaintiff's parole, but that he was behaving nefariously and putting false/fabricated reports/documents in the Plaintiff's file in order to hurt his chances for outside clearance (and parole).

314. Defendant Hopkins was no longer the Plaintiff's counselor; therefore, he should not have had the Plaintiff's file.

315. On June 17, 2020, the Plaintiff sent a request slip to Lisa Reeher asking who grievance nos.87028, 872471, 872472, 872467, and 872474 had been assigned to.

316. On June 22, 2020, Defendant Lisa Reeher responded to the Plaintiff's June 17, 2020, request slip and stated that Defendant Perrin had been assigned to investigate several of the Plaintiffs' grievances.

317. On June 23, 2020, the Plaintiff sent request slips to Defendants T.Biel and Defendant Lisa Reeher stating that, among other things, that they had sent the Plaintiffs' grievances to Defendant Perrin for review when

she was the subject of the complaints; and, consequently, they had violated his rights.

318. Defendant Lisa Reeher and Defendant T.Biel stated the following in their response to the Plaintiff's request slips dated June 23, 2020: "Your grievances have been assigned to Major Blicha."

319. On June 25, 2020, the Plaintiff filed grievance no.874969 against Defendant Lisa Reeher and Defendant T.Biel stating, among other things, the following: "T.Biel and Lisa Reeher have retaliated against me for exercising my constitutional rights by obstructing the grievance procedure through assigning the subject of the grievance to investigate the grievance. T.Biel and Lisa Reeher were aware of my attempts to exercise my constitutional rights and I've suffered an adverse action at the hands of Lisa Reeher and T.Biel sufficient to deter an ordinary person from exercising his rights; and my constitutionally protected conduct was a substantial or motivating factor in T.Biel and Lisa Reeher's actions.

320. On June 29, 2020, Defendant Major Blica came to B-Unit to speak with the Plaintiff about several of his grievances.

321. Defendant Blicha also stated to the Plaintiff that his request for outside clearance had been denied.

322. The Plaintiff then asked Defendant Major Blicha why he had been denied outside clearance, and he stated to the Plaintiff that he did not receive the institution's support/vote.

323. The Plaintiff then asked Defendant Major Blicha why he did not receive the institution's support, and he had given the Plaintiff several alleged explanations.

324. Defendant Major Blicha also stated that there were "better" candidates than the Plaintiff for an outside clearance job assignment.

325. Defendant Major Blicha then stated to the Plaintiff that he did not care about the issue that he had with Defendant Perrin, and that he [the Plaintiff] had made his job harder since he been assigned to respond to his grievances.

326. The Plaintiff was confused as to how he could have been denied outside clearance by the Defendants when it was the Defendants that had recommended that he be paroled.

327. It wasn't until after the Plaintiff filed grievance no.870064 that Defendant Perrin and Defendant Hopkins submitted the Plaintiff's application for outside clearance to PRC for review.

328. Defendant Hopkins and Defendant Perrin submitted the application for outside clearance on the same day that they were informed of the Plaintiff's grievance.

329. To recommend the Plaintiff for parole and then to turn around and deny him an outside clearance work assignment is non-sensical. The criteria for making parole and working on outside clearance work assignment is essentially the same. In fact, getting a recommendation

for parole is more stringent than getting approved for an outside

clearance job assignment.

330. To recommend an inmate for parole means that the administration

trusts and expects that the inmate will be able to properly function in

society.

331. But to deny an inmate an outside clearance work assignment means

that the administration does not believe and/or expect that the inmate

can work in a less secure section for the institution.

332. It is a contradiction for an institution to tell an inmate that they trust

him to work out in the public-which requires much less supervision-than

in a prison job (which has supervision).

333. The Plaintiff then asked Defendant Blicha if there was a

comment/explanation noted in regards as to why he did not get the votes

for outside clearance.

334. Defendant Blicha stated that there weren't any comments made

regarding why he [the Plaintiff] did not receive outside clearance but

that the only thing that had been noted in his file was that he had not

obtained support from the Defendants.

335. Inmates are supposed to have a comment(s)/explanation noted in their

file as to why they did not get approved for outside clearance per DC-

ADM 805.

336. Defendant Blicha then asked the Plaintiff a few more questions

regarding his grievances and then the interview had concluded.

337. On June 25, 2020, the Plaintiff filed grievance no.875603 which stated, among other things, that he was retaliated against by Defendant Perrin, and Defendant Hopkins and recommended a denial for his outside clearance work assignment due to, inter alia, filing grievances.

338. On June 30, 2020, the Plaintiff sent a request slip to Defendant Blicha asking why he did not get approve d for outside clearance and Defendant Blicha stated in his response: "No support."

339. The Plaintiff also sent a request slip to Ms.Best (the Plaintiff's unit manager on B-Unit) asking why he did not get approved for outside clearance and Ms.Best stated the following in her response: "Better candidates."

340. On June 30, 2020, the Plaintiff received a response to grievance no.872471; in grievance no.872471 Defendant Major Blicha stated the following: "I have fully investigated the details pertaining to this grievance. Inmate Oke fails to point out that the unit had a serious staff assault. Inmates were moved for security reasons. Code 93.11 states that inmates may be moved at any time, for any reason, and do not get to choose where they live. No inmate is privileged to live anywhere...He [the Plaintiff] is correct in that being moved to B unit, he is on a different schedule during the pandemic. This is related to structural design and nothing more (i.e., not an additional privilege because it is I unit)."

341. Defendant Blicha's response to grievance no.872471 is intentionally misleading on I-Unit were initially given thirty (30) minutes, just like the rest of the institution at S.C.I. Forest, to have recreation, showers, etc.

342. However, the inmates on I-Unit, because they generally house the lowest custody level inmates at S.C.I. Forest, were eventually given more recreation time, phone time, and shower time because of their status; the extra time allotted to inmates on I-Unit had nothing to do with "structural designs" because the inmates originally on I-unit had the same amount of recreation time as the rest of the inmates in the facility (when the Covid-19 pandemic first occurred).

343. Moreover, Defendant Perrin even stated to the Plaintiff on May 8, 2020, that I-Unit was given extra privileges, that the rest of the institution did not enjoy because of their status and low custody level.

344. The Plaintiff had nothing to do with the alleged "staff assault."

345. The Plaintiff could not have been moved for security concerns because he was not involved in any alleged assaults, he was not affiliated with, nor housed in the same dorm as, the inmate alleged to have initiated the assault; nor was the Plaintiff ever given any misconducts, interviewed, or disciplined for being involved in any staff assault.

346. Defendant Major Blicha's statements were patently false and pretextual.

347. If an inmate is involved in a staff assault, he is subject to the policies listed in S.C.I. Forests "Violence Reduction Strategy."

348. Inmates at S.C.I. Forest were not allowed to be moved, during the prison's quarantine, to other units unless it was a security concern.

349. The Plaintiff was not a "security concern" and he was only moved due to filing grievances and making complaints.

350. On June 30, 2020, The Plaintiff received a response to grievance no.873770.

351. Defendant Blicha stated the following in his response to grievance no.873770: "Contrary to what inmate Oke asserts, an equal number of Black/Hispanic/ and white inmates were moved from the unit at the time.

352. Not only did Defendant Perrin and Defendant Harriger retaliate against the Plaintiff, but they also racially discriminated against the Plaintiff and other black inmates on I-unit by arbitrarily removing them from the unit due to their ethnicity.

353. On June 30, 2020, Defendant Major Blicha issued a response to Plaintiff's grievance no.872467.

354. Defendant Major Blicha stated the following in his response to Plaintiff's grievance no.872467: "The counselor [Defendant Hopkins] did inform inmate Oke that he would likely not support him for outside clearance because overall he did not receive information well, was argumentative, struggled to receive feedback, and did not work well

with staff. He was explained that he did not the type of candidate that
would be suited for a crew that works outside the fence because his
cooperation level would interfere with getting tasks done. The counselor
attempted to explain to him how he was argumentative (provided
examples of where he called the treatment staff racist for not getting
him in their group sooner, went to the Deputy and then took his
response to debate the outside clearance process with the unit team,
struggled with feedback about his areas of improvement on his work
evaluation, etc.). It was explained that outside clearances are better
suited for inmates that required regular minimal supervision."

355. Defendant Blicha, Defendant Perrin, and Defendant Hopkins' response
to grievance no.872467 is riddled with inaccuracies and patently false
statements, which were made outside the scope of their employment,
and which were done in attempt to cover up their unethical,
unprofessional, malicious, wanton, and retaliatory behavior.

356. Plaintiff was denied an outside clearance assignment because he filed
grievances against Defendant Coull, Defendant Hopkins, Defendant
Perrin, and Defendant Josefik.

357. Plaintiff was also denied an outside clearance work assignment
because he complained about Defendant Hopkins' pervasive immoral
and unprofessional conduct to Defendant Mongelluzzo.

358. Plaintiff was not argumentative; Defendant Hopkins and Defendant
Perrin are so highly egotistical that they are incapable of taking criticism

and take it as an attack on them personally. Said defendants mistakenly believe that they are above reproach.

359. As far as Defendant Hopkins' statement that the Plaintiff needs improvement in areas related to his job, the Plaintiff's Inmate Progress Report is devoid of any required commentary reflecting where the areas of improvement are needed.

360. It is also whimsical and contradictory for Defendant Hopkins and Perrin to state that the Plaintiff was not suited for outside clearance because it is generally for inmates that do not need regular supervision because Defendant Perrin and Defendant Hopkins are the same staff members that recommended the Plaintiff to be released on parole- which requires a lot less supervision than working any job in the prison.

361. Thus, it is laughable for Defendant Hopkins and Defendant Perrin to claim in one breath that they trust and believe that the Plaintiff is suited to be released to the public on parole, but then state in the same breath that the Plaintiff is not suited to work in a less secure area of the prison because it requires less supervision.

362. Defendant Blicha, Defendant Hopkins, and Defendant Perrins explanatory are pretextual and a desperate attempt to try and rationalize/justify their inappropriate and reprehensible conduct.

363. The Plaintiff had even previously explained to Defendant Hopkins that he was viewed as a very unfit and unprofessional counselor by several inmates on I-Unit.

364. Defendant Hopkins was the most unprofessional and dishonest counselor that the Plaintiff had ever encountered in the entire time that he was incarcerated.

365. Mr.Crissman, I-Unit's psychological counselor, even stated to the Plaintiff on a prior occasion that he was told by Defendant Hopkins to "slow down" when doing beneficial work for inmates and, on some occasions, Defendant Hopkins told Mr.Crissman to stop doing beneficial work for inmates.

366. The Plaintiff explained to Defendant Hopkins on a prior occasion that he was generally known for his pervasive tendency to prevaricate.

367. On June 30, 2020, Defendant Major Blicha filed a response to grievance no.872472.

368. Defendant Major Blicha stated the following in the initial review response no.872472: "The issue inmate is grieving was in October which is well past the time for grieving. If the inmate wishes to pursue on additional legal box, he can address it with his current unit team. There is no evidence that the inmate had that conversation with the unit manager."

369. On July 16, 2020, the Plaintiff received a response to grievance no.875603.

370. Defendant Gustafson stated, among other things, the following in his initial review response to grievance no.875603: "This investigator spoke with CC2 Hopkins as well as UM Perrin regarding the retaliation

allegations made by Inmate Oke in his grievance. Both parties denied

retaliating against Inmate Oke and independently of one another stated

that they informed him that they were not supporting him because he is

argumentative, and this has the potential to cause problems working

outside the secure perimeter with less supervision.

371. In late June of 2020, or in early July of 2020, Defendant Blum was

   working on B-Unit on the 6 a.m.-2:00 p.m. shift.

372. Defendant Blum worked on I-Unit while the Plaintiff was housed

   there.

373. Defendant Blum came to the Plaintiff's cell at approximately 11:00

   a.m.

374. Defendant Blum stated to the Plaintiff he had heard about all the

   grievances that he had filed against Defendant Hopkins, Defendant

   Josefik, Defendant Perrin, and Defendant Harriger.

375. Defendant Blum then stated to the Plaintiff: "Since you like filing

   grievances you will not be receiving a lunch tray. Now, you can file a

   grievance about that."

376. On September 15, 2020, Defendant Josefik was working on D-Unit , at

   S.C.I, Forest, on the 6 a.m.-2 p.m. shift.

377. The Plaintiff was now housed on D-Unit.

378. The Plaintiff buzzed into the "bubble" or the correctional officers' hub

   at approximately 7:30 a.m. because he had signed up the night before to

   use the telephone at that time.

379. Defendant Josefik was working in the "bubble", and she had asked the Plaintiff who he was so that she could check and see if he was signed up to use the phone.

380. The Plaintiff identified himself and the time that he was signed up for the phone.

381. Defendant Josefik then stated "Oke from I-Unit."

382. Defendant Josefik then stated to the Plaintiff the following: "Since you filed that bullshit grievance on me, you can just forget about your phone call."

383. No one was in the bubble, as the Sergeant was escorting the nurses around the unit to hand out medication.

384. The Defendants have acted outside the scope of their employment.

## LEGAL CLAIMS
## COUNT I – FIRST AMENDMENT VIOLATION-RETALIATION (DEFENDANT HARRIGER)

385. The Plaintiff re-alleges and incorporates by reference by paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY

386. The Plaintiff filed grievance no.870064. The conduct that the Plaintiff was engaged in was constitutionally protected.

387. In grievance no.870064 the Plaintiff complained, inter alia, that he was being retaliated against by Defendant Perrin, Defendant Hopkins, and Defendant Josefik and given negative grades on his Inmate Progress Report due to, inter alia, stating to Defendant Josefik that she was

unpleasant. The conduct that the Plaintiff engaged in was

constitutionally protected.

388. In grievance no.870064, the Plaintiff complained, inter alia, that he

was being retaliated against by Defendant Perrin, Defendant Hopkins,

and Defendant Josefik due to stating that Defendant Josefik that he did

not want to seal with her unless it was necessary. The conduct that the

Plaintiff was engaged in was constitutionally protected.

**B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY**

**DEFENDANT HARRIGER**

389.  The Plaintiff, due to filing grievance no.870064 ,was removed from I-

Unit by Defendant Harriger.

390. S.C.I. Forest was on a modified quarantine schedule; I-Unit was given

extra phone and recreation privileges compared to the other units/blocks

at the institution.

391. At the time the Plaintiff was removed from I-Unit, inmates on the

housing unit were given an hour of either dayroom recreation, telephone

privileges, and kiosk privileges.

392. At the time the Plaintiff was removed from I-Unit, inmates on I-Unit

were given at least an hour of concrete yard recreational privileges

every day.

393. On B-Unit (the unit that the Plaintiff was subsequently moved to), the

Plaintiff was only entitled to approximately thirty (30) minutes of

concrete yard recreational privileges every other day (and the unit was

not given any dayroom recreational privileges).

394. On B-Unit, the Plaintiff was only entitled to thirty (30) minutes of

shower and telephone privileges every day. (And every other day the

inmates on B-Unit were forced to have their concrete recreation,

shower, and telephone privileges all within thirty (30) minutes.)

395. I-Unit is a custody level two (2) unit while B-Unit is a custody level

four (4) unit.

396. I-unit, due to being a custody level two unit, was given more

recreational privileges then the other units at S.C.I Forest (because the

other units are level four units).

397. I-Unit, due to being a custody level two unit, has a lower custody level

and is a "safer" unit compared to other units (which house level four (4)

inmates).

398. On June 8, 2020, time allotted for recreation had been increased for

inmates at S.C.I. Forest.

399. Inmates on I-Unit were given about two (2) hours of recreation

outdoors every day and two (2) hours of dayroom recreation, telephone,

and kiosk privileges (for a total of four (4) hours of recreation every

day).

400. Because the Plaintiff filed grievance no.870064 , Defendant Harriger

had the Plaintiff removed form I-Unit where there were lower custody

level inmates, a safer environment, and increased telephone and

recreational privileges.

### C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITITUINAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM BY DEFENDANT HARRIGER

401. Defendant Harriger stated to the Plaintiff on June 5, 2020, that she, Defendant Perrin, and Defendant Hopkins have all decided that he [the Plaintiff] should be removed from the unit due to filing grievance no.870064.

402. Defendant Harriger stated to the Plaintiff that she was told by Defendant Perrin to make a list of inmates that she wanted to have removed from the unit.

403. Defendant Harriger stated to the Plaintiff that she made sure that she put the Plaintiff's name on the list of inmates that should be removed, due to filing grievances (and that Defendant Hopkins and Defendant Perrin both agreed).

404. Defendant Harriger stated to the Plaintiff before he left for B-Unit, that he was not in any trouble nor would be issued a misconduct for anything.

405. Defendant Perrin approved the move the Plaintiff's move to B-Unit because the Plaintiff filed a grievance.

## COUNT II – RETALIATION (DEFENDANT HOPKINS)

406. The Plaintiff re-alleges and incorporates by reference by paragraphs 1-
384.

### A. THE PLAINTIFF WAS ENGAGED IN
### CONSTITUTIONALLY PROTECTED ACTIVITY

407. The Plaintiff filed grievance no.870064. The conduct that the Plaintiff
was engaged in was constitutionally protected.

408. In grievance no.870064, the Plaintiff complained, inter alia, that he
was being retaliated against by Defendant Perrin, Defendant Hopkins,
and Defendant Josefik, and given negative grades on his Inmate
Progress Report due to, inter alia, stating to Defendant Josefik that she
was unpleasant. The conduct that the Plaintiff engaged in was
constitutionally protected.

409. In grievance no.870064 the Plaintiff complained, inter alia, that he was
being retaliated against by Defendant Perrin, Defendant Hopkins, and
Defendant Josefik due to stating that Defendant Josefik that he did not
want to speak with her unless it was necessary. The conduct that the
Plaintiff was engaged in was constitutionally protected.

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY
### DEFENDANT HOPKINS

410. The Plaintiff, due to filing grievance no.870064, was removed from I-
Unit by Defendant Hopkins.

411. S.C.I. Forest was on a modified quarantine schedule; I-Unit was given extra phone and recreation privileges compared to the other units/blocks at the institution.

412. At the time the Plaintiff was removed from I-Unit, inmates on the housing unit were given an hour of either dayroom recreation, telephone privileges, and kiosk privileges.

413. At the time the Plaintiff was removed from I-Unit, inmates on I-Unit were given at least an hour of concrete yard recreational privileges every day.

414. On B-Unit (the unit that the Plaintiff was subsequently moved to), the Plaintiff was only entitled to approximately thirty (30) minutes of concrete yard recreational privileges every other day (and the unit was not given any dayroom recreational privileges).

415. On B-Unit, the Plaintiff was only entitled to thirty (30) minutes of shower and telephone privileges every day. (And every other day the inmates on B-Unit were forced to have their recreation, shower, and telephone privileges all within thirty (30) minutes.)

416. I-Unit is a custody level two (2) unit while B-Unit is a custody level four (4) unit.

417. I-unit, due to being a custody level two unit, was given more recreational privileges then the other units at S.C.I Forest (because the other units are level four units).

418. I-Unit, due to being a custody level two unit, has a lower custody level and is a "safer" unit compared to other units (which house level four (4) inmates).

419. On June 8, 2020, time allotted for recreation had been increased for inmates at S.C.I. Forest.

420. Inmates on I-Unit were given about two (2) hours of recreation outdoors every day and two (2) hours of dayroom recreation, telephone, and kiosk privileges (for a total of four (4) hours of recreation every day).

421. Because the Plaintiff filed grievance no.870064, Defendant Harriger had the Plaintiff removed from I-Unit where there were lower custody level inmates, a safer environment, and increased telephone and recreational privileges.

## C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITITUINAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM BY DEFENDANT HARRIGER

422. Defendant Harriger stated to the Plaintiff on June 5, 2020, that she, Defendant Perrin, and Defendant Hopkins have all decided that he [the Plaintiff] should be removed from the unit due to filing grievance no.870064.

423. Defendant Harriger stated to the Plaintiff that she was told by
Defendant Perrin to make a list of inmates that she wanted to have
removed from the unit.

424. Defendant Harriger stated to the Plaintiff that she made sure to put the
Plaintiff's name on the list of inmates that should be removed due to
filing grievances, and that Defendant Hopkins and Defendant Perrin
both agreed.

425. Defendant Harriger stated to the Plaintiff, before he left for B-Unit,
that he was not in any trouble-nor would be issued a misconduct for
anything.

426. Defendant Perrin approved the move the Plaintiff's move to B-Unit
because the Plaintiff filed a grievance.

### COUNT III – RETALIATION (DEFENDANT JOSEFIK)

427. The Plaintiff re-alleges and incorporates by reference by paragraphs 1-
384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY

428. The Plaintiff filed grievance no. The conduct that the Plaintiff was
engaged in was constitutionally protected.

429. In grievance no.870064, the Plaintiff complained, inter alia, that he
was being retaliated against by Defendant Perrin, Defendant Hopkins,
and Defendant Josefik, and given negative grades on his Inmate
Progress Report due to, inter alia, stating to Defendant Josefik that she

was unpleasant. The conduct that the Plaintiff engaged in was constitutionally protected.

430. In grievance no.87006,4 the Plaintiff complained, inter alia, that he was being retaliated against by Defendant Perrin, Defendant Hopkins, and Defendant Josefik, due to stating to Defendant Josefik that he did not want to speak with her unless it was necessary. The conduct that the Plaintiff was engaged in was constitutionally protected.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY DEFENDANT JOSEFIK

431. The Plaintiff, due to filing grievance no.870064, was removed from I-Unit by Defendant Harriger.

432. S.C.I. Forest was on a modified quarantine schedule; I-Unit was given extra phone and recreation privileges compared to the other units/blocks at the institution.

433. At the time the Plaintiff was removed from I-Unit, inmates on the housing unit were given an hour of either dayroom recreation, telephone privileges, and kiosk privileges.

434. At the time the Plaintiff was removed from I-Unit, inmates on I-Unit were given at least an hour of concrete yard recreational privileges every day.

435. On B-Unit (the unit that the Plaintiff was subsequently moved to), the Plaintiff was only entitled to approximately thirty (30) minutes of

concrete yard recreational privileges every other day (and the unit was

not given any dayroom recreational privileges).

436. On B-Unit, the Plaintiff was only entitled to thirty (30) minutes of

shower and telephone privileges every day. (And every other day the

inmates on B-Unit were forced to have their concrete recreation,

shower, and telephone privileges all within thirty (30) minutes.)

437. I-Unit is a custody level two (2) unit while B-Unit is a custody level

four (4) unit.

438. I-unit, due to being a custody level two unit, was given more

recreational privileges then the other units at S.C.I Forest (because the

other units are level four units).

439. I-Unit, due to being a custody level two unit, has a lower custody level

and is a "safer" unit compared to other units (which house level four (4)

inmates).

440. On June 8, 2020, time allotted for recreation had been increased for

inmates at S.C.I. Forest.

441. Inmates on I-Unit were given about two (2) hours of recreation

outdoors every day and two (2) hours of dayroom recreation, telephone,

and kiosk privileges (for a total of four (4) hours of recreation every

day).

442. Because the Plaintiff filed grievance no.870064, Defendant Harriger

had the Plaintiff removed from I-Unit where there were lower custody

level inmates, a safer environment, and increased telephone and

recreational privileges.

**C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITITUINAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM BY DEFENDANT HARRIGER**

443. Defendant Harriger stated to the Plaintiff on June 5, 2020, that she, Defendant Perrin, and Defendant Hopkins had all decided that he [the Plaintiff] should be removed from the unit due to filing grievance no.870064.

444. Defendant Harriger stated to the Plaintiff that she was told by Defendant Perrin to make a list of inmates that she wanted to have removed from the unit.

445. Defendant Harriger stated to the Plaintiff that she made sure to put the Plaintiff's name on the list of inmates that should be removed due to filing grievances and that Defendant Hopkins and Defendant Perrin both agreed.

446. Defendant Harriger stated to the Plaintiff, before he left for B-Unit, that he was not in any trouble -nor would be issued a misconduct for anything.

447. Defendant Perrin approved the move the Plaintiff's move to B-Unit because the Plaintiff filed a grievance.

**COUNT IV – RETALIATION (DEFENDANT PERRIN)**

448. The Plaintiff re-alleges and incorporates by reference by paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY

449. The Plaintiff filed grievance no.870064. The conduct that the Plaintiff was engaged in was constitutionally protected.

450. In grievance no.870064, the Plaintiff complained, inter alia, that he was being retaliated against by Defendant Perrin, Defendant Hopkins, and Defendant Josefik, and given negative grades on his Inmate Progress Report due to, inter alia, stating to Defendant Josefik that she was unpleasant. The conduct that the Plaintiff engaged in was constitutionally protected.

451. In grievance no.870064 the Plaintiff complained, inter alia, that he was being retaliated against by Defendant Perrin, Defendant Hopkins, and Defendant Josefik due to stating to Defendant Josefik that he did not want to speak with her unless it was necessary. The conduct that the Plaintiff was engaged in was constitutionally protected.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY DEFENDANT PERRIN

452. The Plaintiff, due to filing grievance no.870064, was removed from I-Unit by Defendant Perrin.

453. S.C.I. Forest was on a modified quarantine schedule; I-Unit was given extra phone and recreation privileges compared to the other units/blocks at the institution.

454. At the time the Plaintiff was removed from I-Unit, inmates on the housing unit were given an hour of either dayroom recreation, telephone privileges, and kiosk privileges.

455. At the time the Plaintiff was removed from I-Unit, inmates on I-Unit were given at least an hour of concrete yard recreational privileges every day.

456. On B-Unit (the unit that the Plaintiff was subsequently moved to), the Plaintiff was only entitled to approximately thirty (30) minutes of concrete yard recreational privileges every other day (and the unit was not given any dayroom recreational privileges).

457. On B-Unit, the Plaintiff was only entitled to thirty (30) minutes of shower and telephone privileges every day. (And every other day the inmates on B-Unit were forced to have their concrete yard recreation, shower, and telephone privileges all within thirty (30) minutes.)

458. I-Unit is a custody level two (2) unit while B-Unit is a custody level four (4) unit.

459. I-unit, due to being a custody level two unit, was given more recreational privileges then the other units at S.C.I Forest (because the other units are level four units).

460. I-Unit, due to being a custody level two unit, has a lower custody level and is a "safer" unit compared to other units (which house level four (4) inmates).

461. On June 8, 2020, time allotted for recreation had been increased for inmates at S.C.I. Forest.

462. Inmates on I-Unit were given about two (2) hours of recreation outdoors every day and two (2) hours of dayroom recreation, telephone, and kiosk privileges (for a total of four (4) hours of recreation every day).

463. Because the Plaintiff filed grievance no.870064, Defendant Harriger had the Plaintiff removed from I-Unit where there were lower custody level inmates, a safer environment, and increased telephone and recreational privileges.

## C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITITUINAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM BY DEFENDANT HARRIGER

464. Defendant Harriger stated to the Plaintiff on June 5, 2020, that she, Defendant Perrin, and Defendant Hopkins have all decided that he [the Plaintiff] should be removed from the unit due to filing grievance no.870064.

465. Defendant Harriger stated to the Plaintiff that she was told by Defendant Perrin to make a list of inmates that she wanted to have removed from the unit.

466. Defendant Harriger stated to the Plaintiff that she made sure she put to put his name on the list of inmates that should be removed due to filing grievances, and that Defendant Hopkins and Defendant Perrin both agreed.

467. Defendant Harriger stated to the Plaintiff, before he left for B-Unit, that he was not in any trouble-nor would be issued a misconduct for anything.

468. Defendant Perrin approved the move the Plaintiff's move to B-Unit because the Plaintiff filed a grievance.

## COUNT V –RETALIATION (DEFENDANT PERRIN)

469. The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY

470. The Plaintiff filed a grievance against Defendant Coull. The conduct/speech that the Plaintiff engaged in was/is constitutionally protected.

471. The Plaintiff filed a grievance against Defendants Josefik, Perrin, and Hopkins. The conduct/speech that the Plaintiff engaged in in was constitutionally protected.

472. The plaintiff reported misconduct that Defendant Hopkins was engaged in with Defendant Mongelluzzo.

473. The Plaintiff questioned Defendant Hopkins about his persistent prevarication and unethical behavior in how he handled his [the Plaintiff's] outside clearance.

**B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT**

474. The Plaintiff, because he filed a grievance against Defendant Coull, was given a bad/negative recommendation by Defendants Perrin and Hopkins in regards to the outside clearance process, which prevented the Plaintiff from obtaining a job with higher pay and which would have given him a program that could help with his parole (as well as given the Plaintiff a higher prison classification).

475. The Plaintiff, because he filed a grievance against Defendant Perrin, Defendant Josefik, and Defendant Hopkins, was given a bad/negative recommendation by Defendant Perrin in regard to the vote for outside clearance, which prevented the Plaintiff from obtaining a job with higher pay (among other things). Defendant Perrin's recommendation was rubber-stamped/adopted by Defendants' Mongelluzzo, Adams, Blicha, Perry, and Oberlander.

476. **C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM**

477. Defendant Hopkins stated to the Plaintiff that, because he filed a grievance against he and Defendant Perrin, he [the Plaintiff] would not be given outside clearance as long as he and Defendant Perrin worked on I-Unit. (Defendant Perrin was present when Defendant Hopkins stated this to the Plaintiff.)

478. Defendant Perrin and Defendant Hopkins then issued the Plaintiff a bad/negative recommendation so that he would not be given outside clearance.

479. Defendant Perrin was present with Defendant Hopkins when he told the Plaintiff that he was not going to get outside clearance because he was "argumentative." (The Plaintiff was not argumentative; he simply questioned him on the details of the outside clearance process and filed a grievance against Defendant Coull.)

480. Defendant Hopkins stated to the Plaintiff that PRC members would just go along with whatever he and Defendant Perrin voted, which would be a vote to decline the Plaintiff's request for outside clearance.

481. Defendant Blicha stated to the Plaintiff that he was going to go along with Defendant Perrin and Defendant Hopkins' recommendation.

482. Defendants PRC and Oberlander chose not to give the Plaintiff outside clearance, based off Defendant Perrin and Defendant Hopkins' negative recommendation.

483.

**COUNT VI – RETALIATION (DEFENDANT HOPKINS)**

484. The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

485. **A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY**

486. The Plaintiff filed a grievance against Defendant Coull. The conduct/speech that the Plaintiff engaged in was/is constitutionally protected.

487. The Plaintiff filed a grievance against Defendants Josefik, Perrin, and Hopkins. The conduct/speech that the Plaintiff engaged in is/was constitutionally protected.

488. The Plaintiff reported misconduct that Defendant Hopkins was engaged in with Defendant Mongelluzzo.

489. The Plaintiff questioned Defendant Hopkins about his persistent prevarication and unethical behavior in how he handled his [the Plaintiff's] outside clearance.

**B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT**

490. The Plaintiff, because he filed a grievance against Defendant Coull, was given a bad/negative recommendation by Defendants Perrin and Hopkins in regards to the outside clearance process, which prevented the Plaintiff from obtaining a job with higher pay and which would have given him a program that could help with his parole (as well as given the Plaintiff a higher prison classification).

491. The Plaintiff, because he filed a grievance against Defendant Perrin, Defendant Josefik, and Defendant Hopkins, was given a bad/negative recommendation by Defendant Perrin in regard to the vote for outside clearance, which prevented the Plaintiff from obtaining a job with higher pay (among other things). Defendant Perrin's recommendation was rubber-stamped/adopted by Defendants' Mongelluzzo, Adams, Blicha, Perry, and Oberlander.

492. **C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM**

493. Defendant Hopkins stated to the Plaintiff that, because he filed a grievance against he and Defendant Perrin, he [the Plaintiff] would not be given outside clearance as long as he and Defendant Perrin worked on I-Unit. (Defendant Perrin was present when Defendant Hopkins stated this to the Plaintiff.)

494. Defendant Perrin and Defendant Hopkins then issued the Plaintiff a bad/negative recommendation so that he would not be given outside clearance.

495. Defendant Perrin was present with Defendant Hopkins when he told the Plaintiff that he was not going to get outside clearance because he was "argumentative." (The Plaintiff was not argumentative; he simply questioned him on the details of the outside clearance process and filed a grievance against Defendant Coull.)

496. Defendant Hopkins stated to the Plaintiff that PRC members would just go along with whatever he and Defendant Perrin voted, which would be a vote to decline the Plaintiff's request for outside clearance.

497. Defendant Blicha stated to the Plaintiff that he was going to go along with Defendant Perrin and Defendant Hopkins' recommendation

498.     Defendants PRC and Oberlander chose not to give the Plaintiff outside clearance, based off Defendant Perrin and Defendant Hopkins' negative recommendation.

### VII. RETALIATION (DEFENDANT PERRY)

499.     The Plaintiff re-alleges and incorporates by reference paragraphs 1-378.

500.     **A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY**

501.  The Plaintiff filed a grievance against Defendant Coull. The conduct/speech that the Plaintiff engaged in was/is constitutionally protected.

502. The Plaintiff filed a grievance against Defendants Josefik, Perrin, and Hopkins. The conduct/speech that the Plaintiff engaged in is/was constitutionally protected.

503. The Plaintiff reported misconduct that Defendant Hopkins was engaged in with Defendant Mongelluzzo.

504. The Plaintiff questioned Defendant Hopkins about his persistent prevarication and unethical behavior in how he handled his [the

Plaintiff's] outside clearance.

**B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT**

505. The Plaintiff, because he filed a grievance against Defendant Coull, was given a bad/negative recommendation by Defendants Perrin and Hopkins in regards to the outside clearance process, which prevented the Plaintiff from obtaining a job with higher pay and which would have given him a program that could help with his parole (as well as given the Plaintiff a higher prison classification).

506. The Plaintiff, because he filed a grievance against Defendant Perrin, Defendant Josefik, and Defendant Hopkins, was given a bad/negative recommendation by Defendant Perrin in regard to the vote for outside clearance, which prevented the Plaintiff from obtaining a job with higher pay (among other things). Defendant Perrin's recommendation was rubber-stamped/adopted by Defendants' Mongelluzzo, Adams, Blicha, Perry, and Oberlander.

507. **C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM**

508. Defendant Hopkins stated to the Plaintiff that, because he filed a grievance against he and Defendant Perrin, he [the Plaintiff] would not be given outside clearance as long as he and Defendant Perrin worked

on I-Unit. (Defendant Perrin was present when Defendant Hopkins

stated this to the Plaintiff.)

509. Defendant Perrin and Defendant Hopkins then issued the Plaintiff a

bad/negative recommendation so that he would not be given outside

clearance.

510. Defendant Perrin was present with Defendant Hopkins when he told

the Plaintiff that he was not going to get outside clearance because he

was "argumentative." (The Plaintiff was not argumentative; he simply

questioned him on the details of the outside clearance process and filed

a grievance against Defendant Coull.)

511. Defendant Hopkins stated to the Plaintiff that PRC members would

just go along with whatever that he and Defendant Perrin voted, which

would be a vote to decline the Plaintiff's request for outside clearance.

512. Defendant Blicha stated to the Plaintiff that he was going to go along

with Defendant Perrin and Defendant Hopkins' recommendation

513.         Defendants PRC and Oberlander chose not to give the Plaintiff

outside clearance, based off Defendant Perrin and Defendant Hopkins'

negative recommendation.

## VII – RETALIATION (DEFENDANT MONGELUZZO)

514.       The Plaintiff re-alleges and incorporates by reference

paragraphs 1-378.

## A. THE PLAINTIFF WAS ENGAGED IN
## CONSTITUTIONALLY PROTECTED ACTIVITY

515. The Plaintiff filed a grievance against Defendant Coull. The
conduct/speech that the Plaintiff engaged in was constitutionally
protected.

516. The Plaintiff filed a grievance against Defendants Josefik, Perrin, and
Hopkins. The conduct/speech that the Plaintiff engaged in was
constitutionally protected.

517. The Plaintiff reported misconduct that Defendant Hopkins was
engaged in with Defendant Mongelluzzo.

518. The Plaintiff questioned Defendant Hopkins about his persistent
prevarication and unethical behavior in how he handled his [the
Plaintiff's] outside clearance.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

519. The Plaintiff, because he filed a grievance against Defendant Coull,
was given a bad/negative recommendation by Defendants Perrin and
Hopkins in regards to the outside clearance process, which prevented
the Plaintiff from obtaining a job with higher pay and which would have
given him a program that could help with his parole (as well as given
the Plaintiff a higher prison classification).

520. The Plaintiff, because he filed a grievance against Defendant Perrin,
Defendant Josefik, and Defendant Hopkins, was given a bad/negative
recommendation by Defendant Perrin in regard to the vote for outside
clearance, which prevented the Plaintiff from obtaining a job with

higher pay (among other things). Defendant Perrin's recommendation was rubber-stamped/adopted by Defendants' Mongelluzzo, Adams, Blicha, Perry, and Oberlander.

521. **C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM**

522. Defendant Hopkins stated to the Plaintiff that, because he filed a grievance against he and Defendant Perrin, he [the Plaintiff] would not be given outside clearance as long as he and Defendant Perrin worked on I-Unit. (Defendant Perrin was present when Defendant Hopkins stated this to the Plaintiff.)

523. Defendant Perrin and Defendant Hopkins then issued the Plaintiff a bad/negative recommendation so that he would not be given outside clearance.

524. Defendant Perrin was present with Defendant Hopkins when he told the Plaintiff that he was not going to get outside clearance because he was "argumentative." (The Plaintiff was not argumentative; he simply questioned him on the details of the outside clearance process and filed a grievance against Defendant Coull.)

525. Defendant Hopkins stated to the Plaintiff that PRC members would just go along with whatever that he and Defendant Perrin voted, which would be a vote to decline the Plaintiff's request for outside clearance.

526. Defendant Blicha stated to the Plaintiff that he was going to go along with Defendant Perrin and Defendant Hopkins' recommendation

527.       Defendants PRC and Oberlander chose not to give the Plaintiff outside clearance, based off Defendant Perrin and Defendant Hopkins' negative recommendation.

## VIII. RETALIATION (DEFENDANT ADAMS)

528.       The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY

529.  The Plaintiff filed a grievance against Defendant Coull. The conduct/speech that the Plaintiff engaged in was/is constitutionally protected.

530. The Plaintiff filed a grievance against Defendants Josefik, Perrin, and Hopkins. The conduct/speech that the Plaintiff engaged in was constitutionally protected.

531. The Plaintiff reported misconduct that Defendant Hopkins was engaged in with Defendant Mongelluzzo.

532. The Plaintiff questioned Defendant Hopkins about his persistent prevarication and unethical behavior in how he handled his [the Plaintiff's] outside clearance.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

533. The Plaintiff, because he filed a grievance against Defendant Coull, was given a bad/negative recommendation by Defendants Perrin and Hopkins in regards to the outside clearance process, which prevented the Plaintiff from obtaining a job with higher pay and which would have given him a program that could help with his parole (as well as given the Plaintiff a higher prison classification).

534. The Plaintiff, because he filed a grievance against Defendant Perrin, Defendant Josefik, and Defendant Hopkins, was given a bad/negative recommendation by Defendant Perrin regarding the vote for outside clearance, which prevented the Plaintiff from obtaining a job with higher pay (among other things). Defendant Perrin's recommendation was rubber-stamped/adopted by Defendants' Mongelluzzo, Adams, Blicha, Perry, and Oberlander.

535. **C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM**

536. Defendant Hopkins stated to the Plaintiff that, because he filed a grievance against he and Defendant Perrin, he [the Plaintiff] would not be given outside clearance as long as he and Defendant Perrin worked on I-Unit. (Defendant Perrin was present when Defendant Hopkins stated this to the Plaintiff.)

537. Defendant Perrin and Defendant Hopkins then issued the Plaintiff a bad/negative recommendation so that he would not be given outside clearance.

538. Defendant Perrin was present with Defendant Hopkins when he told the Plaintiff that he was not going to get outside clearance because he was "argumentative." (The Plaintiff was not argumentative; he simply questioned him on the details of the outside clearance process and filed a grievance against Defendant Coull.)

539. Defendant Hopkins stated to the Plaintiff that PRC members would just go along with whatever he and Defendant Perrin voted, which would be a vote to decline the Plaintiff's request for outside clearance.

540. Defendant Blicha stated to the Plaintiff that he was going to go along with Defendant Perrin and Defendant Hopkins' recommendation

541. Defendants PRC and Oberlander chose not to give the Plaintiff outside clearance, based off Defendant Perrin and Defendant Hopkins' negative recommendation.

## IX. RETALIATION (DEFENDANT GUSTAFSON)

542.    The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY

543.        The Plaintiff filed a grievance against Defendant Coull. The

conduct/speech that the Plaintiff engaged in was/is constitutionally

protected.

544.        The Plaintiff filed a grievance against Defendants Josefik,

Perrin, and Hopkins. The conduct/speech that the Plaintiff engaged in

was constitutionally protected.

545.        The Plaintiff reported misconduct that Defendant Hopkins was

engaged in with Defendant Mongelluzzo.

546.        The Plaintiff questioned Defendant Hopkins about his persistent

prevarication and unethical behavior in how he handled his [the

Plaintiff's] outside clearance.

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

547.        The Plaintiff, because he filed a grievance against Defendant

Coull, was given a bad/negative recommendation by Defendants Perrin

and Hopkins in regard to the outside clearance process, which

prevented the Plaintiff from obtaining a job with higher pay and which

would have given him a program that could help with his parole (as

well as given the Plaintiff a higher prison classification).

548.        The Plaintiff, because he filed a grievance against Defendant

Perrin, Defendant Josefik, and Defendant Hopkins, was given a

bad/negative recommendation by Defendant Perrin regarding the vote

for outside clearance, which prevented the Plaintiff from obtaining a

job with higher pay (among other things). Defendant Perrin's

recommendation was rubber-stamped/adopted by Defendants'

Mongelluzzo, Adams, Blicha, Perry, and Oberlander.

549.     **C. THERE IS A CASUAL LINK BETWEEN THE**

**EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL**

**RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST**

**HIM**

550.     Defendant Hopkins stated to the Plaintiff that, because he filed

a grievance against he and Defendant Perrin, he [the Plaintiff] would

not be given outside clearance as long as he and Defendant Perrin

worked on I-Unit. (Defendant Perrin was present when Defendant

Hopkins stated this to the Plaintiff.)

551.     Defendant Perrin and Defendant Hopkins then issued the

Plaintiff a bad/negative recommendation so that he would not be given

outside clearance.

552.     Defendant Perrin was present with Defendant Hopkins when he

told the Plaintiff that he was not going to get outside clearance because

he was "argumentative." (The Plaintiff was not argumentative; he

simply questioned him on the details of the outside clearance process

and filed a grievance against Defendant Coull.)

553.     Defendant Hopkins stated to the Plaintiff that PRC members

would just go along with whatever he and Defendant Perrin voted,

which would be a vote to decline the Plaintiff's request for outside
clearance.

554.     Defendant Blicha stated to the Plaintiff that he was going to go

along with Defendant Perrin and Defendant Hopkins' recommendation

Defendants PRC and Oberlander chose not to give the Plaintiff outside

clearance, based off Defendant Perrin and Defendant Hopkins' negative

recommendation.

## X – RETALIATION (DEFENDANT JOSEFIK)

555.     The Plaintiff re-alleges and incorporates by reference
paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN

## CONSTITUTIONALLY PROTECTED ACTIVITY

556.     The Plaintiff filed grievances against Defendant Josefik. The

conduct that the Plaintiff engaged in was protected.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION

## BY THE DEFENDANT

557.     On September 15, 2020, the Plaintiff was scheduled for a 7:30

a.m. telephone call. (The Plaintiff was now housed on D-unit.)

558.     Defendant Josefik worked on D-unit as the "Bubble" officer,

i.e., she was in control of letting inmates out of their cells.

559.     The Plaintiff rang into the bubble ,via the intercom, so that he

could be let out for his 7:30 a.m., telephone call.

560.    Defendant Josefik refused to allow the Plaintiff to use the

telephone, which was scheduled at 7:30 a.m., because she stated that he

had filed grievances against her.

## C. THERE IS A CASUAL LINK BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

561.    Defendant Josefik stated to the Plaintiff that because he filed

"bullshit" grievances, she would not let him out to use his scheduled

telephone call (so that the Plaintiff could call his family).

## XI . RETALIATION (DEFENDANT BLUM)

562.    The Plaintiff re-alleges and incorporates by reference

paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

563.    The Plaintiff filed several grievances against Defendants

Perrin, Hopkins, Josefik, and Harriger.

564.    The conduct that the Plaintiff engaged in was constitutionally

protected.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

565.    Defendant Blum would not allow the Plaintiff to eat at lunch

time and denied him a food tray.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

566.    Defendant Blum stated to the Plaintiff that because he filed grievances against Defendants Josefik, Blum, Hopkins, and Harriger that he would not be given a good tray.

### XII . RETALIATION (DEFENDANT COULL)

567.    The Plaintiff re-alleges and incorporates by reference paragraphs 1-378.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

568.    The Plaintiff filed a grievance against Defendant Coull. The conduct that the Plaintiff engaged in was protected.

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

569.    Defendant Coull instructed Defendant Hopkins to retaliate against the Plaintiff for filing a grievance against her (alleging racial discrimination) and, consequently, Defendant Hopkins recommended the Plaintiff's denial of an outside clearance job assignment, which resulted in a more beneficial prison status/classification and an increased pay.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE

## EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS

## AND THE ADVERSE ACTION TAKEN AGAINST HIM

570.    Defendant Coull stated to the Plaintiff on June 5, 2020, that she

had instructed Defendant Hopkins to "get back" at the Plaintiff for

filing a grievance against her. Defendant Coull also stated that

Defendant Hopkins stated that he recommended the Plaintiff's request

for an outside clearance job assignment be denied.

Defendant Hopkins stated to the Plaintiff that he was recommending a

denial of an outside clearance assignment because, inter alia, his [the

Plaintiff's] complaints against Defendant Coull.

### XIII . RETALIATION (DEFENDAN T.BIEL)

571.    The Plaintiff re-alleges and incorporates by reference

paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN

### CONSTITUTIONALLY PROTECTED ACTIVITY.

572.    The Plaintiff filed several grievances against Defendant Perrin.

(The conduct that the Plaintiff engaged in was constitutionally

protected.

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY

### THE DEFENDANT

573.    Defendant T.Biel referred the Plaintiff's grievances to

Defendant Perrin for investigation and disposition-even though

Defendant Perrin was a subject in each of the Plaintiff's grievances. (It

is strictly prohibited by DOC Policy for a grievance coordinator to refer

a grievance to a staff member who is also the subject of that grievance.)

574.    Defendant T.Biel referred the Plaintiff's grievance to

Defendant Perrin  in an attempt to obstruct the grievance process and

deny the Plaintiff a full and fair review of his issues.

### C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

575.    Defendant T.Biel was the grievance coordinator who assigned

the Plaintiff's grievances to Defendant Perrin for investigation and

disposition. See Exhibits

### XIV . RETALIATION (LISA REEHER)

576.    The Plaintiff re-alleges and incorporates by reference

paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

577.    The Plaintiff filed several grievances against Defendant Perrin.

The conduct that the Plaintiff engaged in was constitutionally

protected.

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

578.     Defendant Lisa Reeher referred the Plaintiff's grievances
to Defendant Perrin for investigation and disposition-even though
Defendant Perrin was a subject in each of the Plaintiff's grievances. (It
is strictly prohibited by DOC Policy for a grievance coordinator to refer
a grievance to a staff member who is also the subject of that grievance.)
Defendant T.Biel referred the Plaintiff's grievance to Defendant Perrin
in an attempt to obstruct the grievance process and deny the Plaintiff a
full and fair review of his issues.

## XV. RETALIATION (DEFENDANT HOPKINS)

579.     The Plaintiff re-alleges and incorporates by reference
paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN
## CONSTITUTIONALLY PROTECTED ACTIVITY.

580.     The Plaintiff filed a grievance against Defendant Coull.

581.     The Plaintiff stated to Defendant Josefik that, due to her using
profanity and abusive language towards him, when he asked for a
grievance, he found her to be "unpleasant" to deal with.

582.     The speech/conduct that Plaintiff engaged in was protected

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY
## THE DEFENDANT

583.     Because the Plaintiff filed grievances against Defendant
Josefik (among other things), Defendant Hopkins falsified the
Plaintiff's Inmate Progress Report, and gave the Plaintiff several

bad/negative grades on said report (that were not justified), which

would be submitted with his parole documents; this was done to hurt

the Plaintiff's chances of obtaining parole.

584.    Because the Plaintiff filed grievances against Defendant Josefik

(among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report, and gave the Plaintiff several bad/negative

grades on said report. This was done in order to deny the Plaintiff an

outside clearance job, which would lead to increased pay and a higher

prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE

## EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS

## AND THE ADVERSE ACTION TAKEN AGAINST HIM

585.    Defendant Hopkins stated to the Plaintiff that the sole reason

that he obtained negative and bad grades on his Inmate Progress Report

was because he called Defendant Josefik "unpleasant".

586.    Defendant Josefik stated to Defendant Hopkins that the

Plaintiff stated that she was unpleasant so that he could falsify his

Inmate Progress Report.

587.    Defendant Hopkins stated that the Plaintiff was

"argumentative"-due to having filed a grievance against Defendant

Coull and, consequently, he was not granted an outside clearance work

assignment.

588.    Defendant Perrin was complicit in the retaliation and falsified the Plaintiff's Inmate Progress Report and, subsequently, submitted it to the parole board.

## XVI . RETALIATION (DEFENDANT JOSEFIK)

589.    The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

590.    The Plaintiff filed a grievance against Defendant Coull.

591.    The Plaintiff stated to Defendant Josefik that due to her using profanity and abusive language towards him, when he asked for a grievance, he found her to be "unpleasant" to deal with.

592.    The speech/conduct that Plaintiff engaged in was protected

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

593.    Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's Inmate Progress Report, and gave the Plaintiff several bad/negative grades on said report (that were not justified), which would be submitted with his parole documents; this was done to hurt the Plaintiff's chances of obtaining parole.

594.    Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report, and gave the Plaintiff several bad/negative grades on said report. This was done in order to deny the Plaintiff an outside clearance job, which would to increased pay and a higher prison classification.

### C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

595.    Defendant Hopkins stated to the Plaintiff that the sole reason that he obtained negative and bad grades on his Inmate Progress Report was because he called Defendant Josefik "unpleasant".

596.    Defendant Josefik stated to Defendant Hopkins that the Plaintiff stated that he was unpleasant so that he could falsify his Inmate Progress Report.

597.    Defendant Hopkins stated that the Plaintiff was "argumentative"-due to having filed a grievance against Defendant Coull and, consequently, he was not granted an outside clearance work assignment.

598.    Defendant Perrin was complicit in the retaliation and falsified the Plaintiff's Inmate Progress Report and, subsequently, submitted it to the parole board.

### XVII . RETALIATION (DEFENDANT PERRIN)

599.    The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

600.    The Plaintiff filed a grievance against Defendant Coull.

601.    The Plaintiff stated to Defendant Josefik that, due to her using profanity and abusive language towards him, when he asked for a grievance, he found her to be "unpleasant" to deal with.

602.    The speech/conduct that Plaintiff engaged in was protected

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

603.    Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's Inmate Progress Report and gave the Plaintiff several bad/negative grades on said report (that were not justified), which would be submitted with his parole documents; this was done to hurt the Plaintiff's chances of obtaining parole.

604.    Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's Inmate Progress Report, and gave the Plaintiff several bad/negative grades on said report. This was done in order to deny the Plaintiff an outside clearance job, which would have led to increased pay and a higher prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

605.     Defendant Hopkins stated to the Plaintiff that the sole reason that he obtained negative and bad grades on his Inmate Progress Report was because he called Defendant Josefik "unpleasant".

606.     Defendant Josefik stated to Defendant Hopkins that the Plaintiff stated that he was unpleasant so that he could falsify his Inmate Progress Report.

607.     Defendant Hopkins stated that the Plaintiff was "argumentative"-due to having filed a grievance against Defendant Coull and, consequently, he was not granted an outside clearance work assignment.

608.     Defendant Perrin was complicit in the retaliation and falsified the Plaintiff's Inmate Progress Report and, subsequently, submitted it to the parole board.

### XVIII . RETALIATION (DEFENDANT PERRIN)

609.     The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

610.     The Plaintiff filed a civil action against Michelle Crowther, a U.M. at S.C.I. Forest and an associate/colleague of Defendant Perrin.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

611.    Defendant Perrin refused to prepare the legal memorandum for the Plaintiff's legal cases, as ordered by Defendant Oberlander, because he filed a civil action against Michelle Crowther.

612.    Defendant Perrin's failure to prepare the Plaintiff for a legal memorandum for an extra property box resulted in the Plaintiff being in violation of DOC Policy and could have resulted in his property having been confiscated (as well as receiving a misconduct).

## C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

613.    Defendant Perrin stated to the Plaintiff that because he filed a lawsuit against Michelle Crowther that he would not be receiving a legal property box exception for his legal cases.

### XIX.RETALIATION  (MAJOR BLICHA)

614.    The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

615.    The Plaintiff filed a grievance against Defendant Coull.

616.     The Plaintiff stated to Defendant Josefik that due to her using

profanity and abusive language towards him, when he asked for a

grievance, he found her to be "unpleasant" to deal with.

617.     The speech/conduct that Plaintiff engaged in was protected

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY

## THE DEFENDANT

618.     Because the Plaintiff filed grievances against Defendant

Josefik (among other things), Defendant Hopkins falsified the

Plaintiff's Inmate Progress Report (see Exhibit "I") and gave the

Plaintiff several bad/negative grades on said report (that were not

justified), which would be submitted with his parole documents; this

was done to hurt the Plaintiff's chances of obtaining parole.

619.     Because the Plaintiff filed grievances against Defendant Josefik

(among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report, and gave the Plaintiff several bad/negative

grades on said report. This was done in order to deny the Plaintiff an

outside clearance job, which resulted un increased pay and a higher

prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE

## EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS

## AND THE ADVERSE ACTION TAKEN AGAINST HIM

620.     Defendant Blicha denied the Plaintiff an outside clearance job assignment because of, inter alia, the grievances that he filed and his oral complaints about prison employee misconduct.

## XX.RETALIATION  (MONGELUZZO)

621.     The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

622.     The Plaintiff filed a grievance against Defendant Coull.

623.     The Plaintiff stated to Defendant Josefik that due to her using profanity and abusive language towards him, when he asked for a grievance, he found her to be "unpleasant" to deal with.

624.     The speech/conduct that Plaintiff engaged in was protected.

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

625.     Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's Inmate Progress Report (see Exhibit "I") and gave the Plaintiff several bad/negative grades on said report (that were not justified), which would be submitted with his parole documents; this was done to hurt the Plaintiff's chances of obtaining parole.

626.     Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report and gave the Plaintiff several bad/negative grades on said report. This was done in order to deny the Plaintiff an outside clearance job, which would result in increased pay and a higher prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

627.    Defendant Mongelluzo denied the Plaintiff an outside clearance job assignment because of, inter alia, the grievances that he filed and his oral complaints about prison employee misconduct.

### XXI. RETALIATION  (DEFENDANT ADAMS)

628.    The Plaintiff re-alleges and incorporates by reference paragraphs 1-384.

### A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

629.    The Plaintiff filed a grievance against Defendant Coull.

630.    The Plaintiff stated to Defendant Josefik that due to her using profanity and abusive language towards him, when he asked for a grievance, he found her to be "unpleasant" to deal with.

631.    The speech/conduct that Plaintiff engaged in was protected

### B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT

632.        Because the Plaintiff filed grievances against Defendant

Josefik (among other things), Defendant Hopkins falsified the

Plaintiff's Inmate Progress Report, and gave the Plaintiff several

bad/negative grades on said report (that were not justified), which

would be submitted with his parole documents; this was done to hurt

the Plaintiff's chances of obtaining parole.

633.        Because the Plaintiff filed grievances against Defendant Josefik

(among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report, and gave the Plaintiff several bad/negative

grades on said report. This was done in order to deny the Plaintiff an

outside clearance job, which would result in increased pay and a higher

prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

634.        Defendant Adams denied the Plaintiff an outside clearance job

assignment because of, inter alia, the grievances that he filed and his

oral complaints about prison employee misconduct.

### XXII. RETALIATION (DEFENDANT GUSTAFSON)

635.        The Plaintiff re-alleges and incorporates by reference

paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY.

636.    The Plaintiff filed a grievance against Defendant Coull.

637.    The Plaintiff stated to Defendant Josefik that due to her using profanity and abusive language towards him, when he asked for a grievance, he found her to be "unpleasant" to deal with.

638.    The speech/conduct that Plaintiff engaged in was protected

**B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY THE DEFENDANT**

639.    Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's Inmate Progress Report, and gave the Plaintiff several bad/negative grades on said report (that were not justified), which would be submitted with his parole documents; this was done to hurt the Plaintiff's chances of obtaining parole.

640.    Because the Plaintiff filed grievances against Defendant Josefik (among other things), Defendant Hopkins falsified the Plaintiff's Inmate Progress Report, and gave the Plaintiff several bad/negative grades on said report. This was done in order to deny the Plaintiff an outside clearance job, which would to increased pay and a higher prison classification.

**C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM**

641.    Defendant Gustafson denied the Plaintiff an outside clearance
job assignment because of, inter alia, the grievances that he filed and
his oral complaints about prison employee misconduct.

**XXIII. RETALIATION  (DEFENDANT PERRY)**

642.    The Plaintiff re-alleges and incorporates by reference
paragraphs 1-384.

**A. THE PLAINTIFF WAS ENGAGED IN**

**CONSTITUTIONALLY PROTECTED ACTIVITY.**

643.    The Plaintiff filed a grievance against Defendant Coull.

644.    The Plaintiff stated to Defendant Josefik that due to her using
profanity and abusive language towards him, when he asked for a
grievance, he found her to be "unpleasant" to deal with.

645.    The speech/conduct that Plaintiff engaged in was protected

**B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY**

**THE DEFENDANT**

646.    Because the Plaintiff filed grievances against Defendant
Josefik (among other things), Defendant Hopkins falsified the
Plaintiff's Inmate Progress Report, and gave the Plaintiff several
bad/negative grades on said report (that were not justified), which
would be submitted with his parole documents; this was done to hurt
the Plaintiff's chances of obtaining parole.

647.    Because the Plaintiff filed grievances against Defendant Josefik
(among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report, and gave the Plaintiff several bad/negative

grades on said report. This was done in order to deny the Plaintiff an

outside clearance job, which would to increased pay and a higher

prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE

## EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS

## AND THE ADVERSE ACTION TAKEN AGAINST HIM

648.        Defendant Perry denied the Plaintiff an outside clearance job

assignment because of, inter alia, the grievances that he filed and his

oral complaints about prison employee misconduct.

## XXIV. RETALIATION  (DEFENDANT OBERLANDER)

649.        The Plaintiff re-alleges and incorporates by reference

paragraphs 1-384.

## A. THE PLAINTIFF WAS ENGAGED IN

## CONSTITUTIONALLY PROTECTED ACTIVITY.

650.      The Plaintiff filed a grievance against Defendant Coull.

651.      The Plaintiff stated to Defendant Josefik that due to her using

profanity and abusive language towards him, when he asked for a

grievance, he found her to be "unpleasant" to deal with.

652.      The speech/conduct that Plaintiff engaged in was protected

## B. THE PLAINTIFF SUFFERED AN ADVERSE ACTION BY

## THE DEFENDANT

653.      Because the Plaintiff filed grievances against Defendant

Josefik (among other things), Defendant Hopkins falsified the

Plaintiff's Inmate Progress Report, and gave the Plaintiff several

bad/negative grades on said report (that were not justified), which

would be submitted with his parole documents; this was done to hurt

the Plaintiff's chances of obtaining parole.

654.      Because the Plaintiff filed grievances against Defendant Josefik

(among other things), Defendant Hopkins falsified the Plaintiff's

Inmate Progress Report, and gave the Plaintiff several bad/negative

grades on said report. This was done in order to deny the Plaintiff an

outside clearance job, which would result increased pay and a higher

prison classification.

## C. THERE IS A CASUAL CONNECTION BETWEEN THE EXERCISE OF THE PLAINTIFF'S CONSTITTUTIONAL RIGHTS AND THE ADVERSE ACTION TAKEN AGAINST HIM

655.      Defendant Oberlander denied the Plaintiff an outside clearance

job assignment because of, inter alia, the grievances that he filed and

his oral complaints about prison employee misconduct.

### RELIEF

WHEREFORE, the Plaintiff respectfully requests that the Court grant the

following requests:

656.      $150,000 in compensatory damages.

657.    $250,000 in punitive damages.

658.    Whatever relief the Court deems necessary and appropriate in

the interests of justice.

I, Ayodele Oke, hereby declare, pursuant to 28 U.S.C. 1746, that the

information in this complaint is true and correct to the best of my personal

knowledge. I am competent to attest to the matters so asserted as they are

based upon personal knowledge.


Ayodele Oke
303 Raintree, Lane
Malvern, Pa 19355